UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
--------------------------------------------------------------------X

LIVINGSTONE BROOMES,

                       *Plaintiff,*              **AMENDED COMPLAINT**

          -against-                   Docket No. 22-cv-2807

CITY OF NEW YORK; DETECTIVE VICTOR
PARIBELLO (Tax ▮▮▮▮ ), individually and as a
member of the New York City Police Department,

                       *Defendants.*

--------------------------------------------------------------------X

Plaintiff LIVINGSTONE BROOMES ("PLAINTIFF"), by his attorneys LEVITT & KAIZER, complaining of the Defendants, respectfully alleges, upon information and belief, as follows:

## NATURE OF ACTION

1.    This is a civil action, pursuant to 42 U.S.C. §§ 1983, *Brady v. Maryland*, 373 U.S. 83 (1963), *Monell v. New York City Department of Social Services*, 436 U.S. 658 (1978), and other applicable law, seeking monetary damages for PLAINTIFF'S wrongful arrest, prosecution, conviction and punishment, and imprisonment for approximately three-and-one-half years, during which he was repeatedly abused and traumatized.

2.    PLAINTIFF, a resident of Kings County, New York, who has as full-scale IQ of 58, was wrongly arrested, prosecuted, convicted, and punished for Rape in the Second Degree, in violation of New York Penal Law § 130.30 (2), in connection with *People v. Broomes*, Kings County Indictment No. 3711/11, after having had sex with another person who also had cognitive

disabilities.[1] As was later determined by the District Attorney, Kings County, in its July 9, 2020, report titled *426 Years: An Examination of Wrongful Convictions In Brooklyn, New York*, ("the CRU Report, (Exhibit A), responsibility for this travesty of justice lay squarely at the feet not only of inept defense counsel, but also, among others, the City of New York, the New York City Police Department (NYPD), and the Kings County District Attorney's Office (KCDAO).

3.     PLAINTIFF was exonerated and his case was dismissed, on May 23, 2019, after his newly appointed lawyer filed a motion on his behalf under CPL § 440.10 and the Kings County District Attorney's Office joined that motion following a thorough investigation by the CRU.

### STATEMENT OF VENUE AND JURISDICTION

4.     At all times herein mentioned, PLAINTIFF was a resident of the County of Kings, City of Brooklyn, and State of New York.

5.     DEFENDANT VICTOR PARIBELLO ("DEFENDANT PARIBELLO"), at all relevant times a New York City Police Detective, is sued individually and as a member of the New York City Police Department, DEFENDANT CITY OF NEW YORK ("DEFENDANT CITY OF NEW YORK") is a municipal corporation existing by virtue of the laws of the State of New York.

6.     The New York City Police Department is an agency of the DEFENDANT CITY OF NEW YORK, and DEFENDANT PARIBELLO, was at all times relevant to this Complaint its employee and agent.

---

[1]     "Cognitive disability" as used herein, refers to a broad range of conditions that include intellectual disability, autism spectrum disorders, mental illness, brain injury, stroke, Alzheimer's disease and other dementias, as well as any other condition that may impair a pretrial detainee's ability to understand the charges or his rights, or to meaningfully participate in his defense.

7.      The New York Health and Hospitals Corporation is a public benefits corporation that operates the public hospitals of the DEFENDANT CITY OF NEW YORK, including Bellevue Hospital Prison Ward. *See* N.Y. Unconsol. Laws §§ 7384(1), 7385(1).

8.      At all times relevant to this Complaint, DEFENDANT PARIBELLO acted toward Plaintiff under color of the statutes, ordinances, customs, and usage of the State and City of New York, and within the scope of his employment.

9.      The KCDAO is an agency of Kings County, a constituent County of the City of New York, and of the State of New York

10.      The District Attorney and Assistant District Attorneys of Kings County are agents and employees of both Kings County and the City of New York.


## ALLEGATIONS COMMON TO ALL CAUSES OF ACTION
### PERSONAL AND FAMILY HISTORY

11.      PLAINTIFF was born in Barbados on ███████, 1947. He is one of five children. His parents were poor, and he received little education.

12.      PLAINTIFF had intellectual deficits as a child, which were exacerbated when, while still in Barbados, PLAINTIFF, then in his late teens or early twenties, was severely injured in a motorcycle accident. He broke both his legs, suffered devastating head injuries, and was in a coma for a period of time.

13.      PLAINTIFF arrived in the United States in 1971 and became a lawful permanent resident in 1977.

14.      In 1977, he married Ordeen Bishop Bromes ("Mrs. Broomes", deceased), and the couple resided in Brooklyn, raising four children, born ███████, 1978, ███████, 1980,

██████ 1981, and ████████, 1984. PLAINTIFF has an older daughter born in 1973, from an earlier relationship.

15.    PLANITIFF and Mrs. Broomes separated in 1992 but remained good friends until her death in February 2022.

16.    PLAINTIFF is illiterate, which he attributes to his lack of education, but likely is also the result of an inherent learning disability and the severe brain trauma he suffered in the aforementioned motorcycle accident. He can sign his name, but cannot otherwise read or write.

17.    Personable and well-liked, PLAINTIFF worked for approximately 36 years at the ████████, starting out as a dishwasher and advancing to assist with food preparation. He worked at the ████████ from 1971 to 1976 and then from 1977 to 1997, at which point he retired. At the Club's request, he came out of retirement and returned to work in 1999, retiring again in 2009. Even after his second retirement, PLAINTIFF still assisted the chef in the kitchen from time to time.

**The initial accusation and investigation.**

18.     In 2006, when PLAINTIFF'S mother-in-law ("Mrs. Bishop") was diagnosed with ████████, Mrs. Broomes asked PLAINTIFF, then-retired and living alone, to move in with her mother, which he agreed to do, taking residence with his mother-in-law and her intellectually disabled adult granddaughter, "A." (deceased). A. was born on ████ 1978, and was the complainant in the criminal case.

19.    Mrs. Bishop had a home health aide ("Ms. Holman") during the day. Mrs. Broomes wanted someone there in the evening, aside from just A., because Mrs. Bishop would sneak out when A. went to the bathroom. *See* Mrs. Broomes' Aff., annexed as Exhibit B at ¶ 14.

20.    A. had a mattress on the floor of Mrs. Bishop's bedroom, but generally got in bed

with her grandmother. PLAINTIFF took the remaining bedroom. *Id*. at ¶ 16.

21.     In May of 2011, A. began to look a little heavier than usual. Mrs. Broomes had A. take a home pregnancy test, which was positive. Mrs. Broomes took A. to the hospital where A.'s pregnancy was confirmed. *Id*. at ¶ 23.

22.     A. steadfastly denied to both Mrs. Broomes and the emergency room nurse having had sex at all, but after the nurse persisted, reassuring her that she would not get in trouble, she named PLAINTIFF as her partner. *See* Exhibit B, Mrs. Broomes' Aff., at ¶ 24.

23.     From that point on, the matter was treated as a criminal investigation. Mrs. Broomes and A. were placed in a room within the emergency room where they were questioned by police. They were then taken to the police station and separated. *See* Mrs. Broomes' Aff., Exhibit B at ¶ 24.[2] A., now alone, was roughly questioned by a male detective, DEFENDANT PARIBELLO. Mrs. Broomes, who was seated outside the interview room, could hear the male detective "screaming" at her niece. *Id*. at ¶ 25.

24.     A. allegedly told the police and the Kings County District Attorney's Office that PLAINTIFF had forced her to have sex. Thereafter, however, she told her aunt – Mrs. Broomes – that she had also admitted to the police, as well as to A.D.A. Lisa Nugent, that she had only claimed she was forced to have sex because she was afraid. Specifically, A. was afraid because she had been told she was not supposed to have sex and believed she might be beaten if she told the truth. *Id*. at ¶ 35.

25.     DEFENDANT PARIBELLO volunteered to Mrs. Broomes that A. had made the foregoing admission to him. He related that, upon questioning, A. acknowledged having had sex

---

[2]     Mrs. Broomes is deceased, but we put defendants on notice that her affidavit will be offered into evidence pursuant to Fed.R.Evid. 807 and other applicable law.

with PLAINTIFF on more than five occasions and the detective expressed his view that he did not believe that PLAINTIFF had raped A. *Id*.

26.     When Mrs. Broomes was interviewed by the Kings County District Attorney's Office about the case, she was asked only if A. was disabled at birth, to which she reported that A. had attended school, even graduating from high school. *Id*. at ¶ 27. This appears the basis for the charge, as the CRU's internal report noted, "The only information the prosecutor seemed to have was based on brief interviews of A. and her aunt, and a short, unrecorded, and undocumented evaluation by an expert with a Master's Degree in Social Work, who opined that A. did not have the capacity to consent to sexual activity." Exhibit A1, Internal CRU Report, at 5.

27.     According to the CRU report, when interviewed, Mrs. Broomes related that "she had informed the police and prosecution that [A.] and the defendant had *consensual sex*, but the CRU did not find notes of her statements in the police or prosecution case files." Exhibit A, CRU Report at, 95 (emphasis added).

28.     Mrs. Broomes states in her affidavit that A. [identified immediately below as "██"] told Mrs. Broomes that she alleged she was raped only out of fear and that she acknowledged this as well to A.D.A. Nugent and to the detective on the case:

> ██ told me that she only said Lee [i.e. PLAINTIFF] forced her to have sex because she knew what she did was wrong because Lee was my husband and her cousins' father and she didn't want to get into trouble. She also told me that she said this to A.D.A. Nugent (I had to take ██ over there a couple of times) and to the police -- the detective on the case (the man who was yelling at ██ that first day) told me that she had said this to him.

Exhibit B at ¶ 35.

29.     As a result of the allegations made against him, PLAINTIFF was arrested on May 3, 2011. He was interviewed by DEFENDANT PARIBELLO, and denied raping A., maintaining their relationship was consensual. As the CRU found, "The detective interviewing [Broomes]

either did not detect [Broomes'] mental disability or failed to inform the prosecution of it." Exhibit A, CRU Report, at 30.[3] PLAINTIFF'S incapacity, however, was so obvious that DEFENDANT PARIBELLO unquestionably knew that PLAINTIFF suffered from an extreme mental disability.[4] However, he did not inform the KCDAO office of such. Nor did he inform the KCDAO that, after interviewing A. he concluded she was likely not raped. Nor did he inform the KCDAO that A. had eventually acknowledged she had claimed she was forced to have sex because she was afraid she might be beaten if she said otherwise.

30.     What the CRU did not include is that DEFENDANT PARIBELLO'S affidavit, filed with the arraignment court on May 4, 2011, was based on a fabrication. Therein, DEFENDANT PARIBELLO alleged that he was "informed by [A.]" that she had sex with PLAINTIFF between September 1, 2010, and October 13, 2010. As explained in the next section of this Complaint, that allegation was false.

### GRAND JURY PROCEEDINGS

31.     A grand jury empaneled in Kings County thereafter heard evidence and returned Indictment No. 3711/2011, charging PLAINTIFF with Rape in the Second Degree (two counts),

---

[3]     The public version of the CRU Report identified Plaintiff as "Charlie Bloom" as the case was sealed by operation of law following the vacatur of his conviction and dismissal of indictment.
[4]     The internal CRU report concurs with this view, explaining,

>          It seems unlikely that a third possibility, that the detective failed to recognize any defect because none existed, is plausible since defense counsel immediately recognized that the defendant was slow (but he failed to perceive or consider the extent of such), the defendant had lifelong severe mental disabilities (as illustrated by his 58 IQ), and within a few months of the arrest, the defendant was displaying noticeable signs of dementia.

Exhibit A1, Internal CRU Report, at 14, n.25.

Sexual Misconduct (two counts) and Sexual Abuse in the Second Degree. (Exhibit C, Indictment).

32.    A. testified before the grand jury. Without doubt her grand jury testimony was coached, because certain of her key testimony was related in language entirely inconsistent with her limited intelligence.

33.    Additionally, when A. advised the Assistant District Attorney presenting the case to the grand jury that she had something additional to say, the ADA removed her from the grand jury room and when they returned A. was not provided an opportunity to add to her testimony as she had requested.

34.    Psychologist Cheryl Paradis, who prepared a forensic psychological report of PLAINTIFF and A. at the request of ADA Eric Sonnenschein of the Brooklyn District Attorney's Office's Conviction Review Unit, related:

> I reviewed a transcript of [A.]'s Grand Jury testimony. It is interesting to note that she responded to a question this way: "I told him that I'm a mentally retarded person..." This seems like an unusual and overly formal type of comment, inconsistent with her style of speaking. It raises the question of whether these were not her choice of words, but instead a phrase that she rehearsed. Later, she spontaneously asked, "Can I say something?"  ADA Nugent then said, "Let's talk outside, come with me." [A.]'s request to, "say something" indicates that she had something to add to her testimony, something she wanted to explain or clarify. Unfortunately, since she was not permitted to do this in the courtroom, it is not possible, years later, to come to any conclusions about what she wanted to add. It raises the possibility that she felt that her answers did not fully explain what had occurred between her and PLAINTIFF.

Exhibit D, Cheryl Paradis Report, at 14.[5]

35.    Absent from the CRU report, however, is that ADA Lisa Nugent noted, following the presentment of the case to the Grand Jury, that "CW is mentally disabled, has cerebral palsy and suffers from seizures which cause memory loss. CW can recall one period of time in January

---

[5]    In Cheryl Paradis' report, A. is referred to as "████████."

when Deft had sex with her." A.'s inability to recall a sexual encounter with PLAINTIFF in September and October was never disclosed to the defense, nor was the fact that A.'s condition "cause[d] memory loss." The Grand Jury indicted PLAINTIFF for acts committed between September 1 and October 13, 2010, in addition to January 2011. PLAINTIFF ultimately plead guilty to events occurring between September and October 2010. ADA Nugent's memo puts the lie to DEFENDANT PARIBELLO's claim that he was "informed by [A.]" that she had sex with PLAINTIFF between September 1, 2010, and October 13, 2010. It also raised serious questions regarding the accuracy and credibility of A.'s supposed claim that her sex with Mr. Broomes was non-consensual.

36.     PLAINTIFF was held on Rikers Island pending disposition. Records from Rikers Island reflect PLAINTIFF was placed in protective custody a week after his arrival because other inmates threatened to kill him after learning the nature of the accusation against him. Rikers Island Protective Custody Paperwork is annexed hereto as Exhibit E.[6]

37.     The Voluntary Disclosure Form and Notice, provided pursuant to C.P.L. § 710.30, asserted that PLAINTIFF told a detective that he had been having "consensual sex" with A. for the past year. The Voluntary Disclosure Form is annexed hereto as Exhibit F. *See* Exhibit F at 10.

38.     A. gave birth to a daughter, "F.", in ███████ .

39.     PLAINTIFF was proven to be F.'s father by a DNA test.

---

[6]     PLAINTIFF experienced other traumatizing events while incarcerated on Rikers Island, including an incident in which another inmate gave him a bear hug that cause pain in his waist and belly and shooting down to his foot. He described another incident when cold water was thrown on him while he was sleeping, and another in which an inmate sprayed air freshener near him, which made his eyes burn. Additionally, PLAINTIFF recalls the doctor accidentally gave him two flu shots in one day which reportedly caused him to hallucinate seeing dead dogs come from the ceiling.

## TRANSFER TO HOSPITAL AND PHYSICAL/MENTAL EVALUATION

40.     A few weeks after his arrest, and ten months before his plea, PLAINTIFF was transferred from Rikers Island to Bellevue Hospital in May of 2011 because of chest pains.

41.     Records from that hospitalization reveal that, among other health issues, PLAINTIFF had a history of ███████████████████████████████████ ████████████████████ in approximately 2001. Records from PLAINTIFF'S May 2011 hospitalization are annexed hereto as Exhibit G.[7] *See* Exhibit G, May 25, 2011, at 2.

42.     Bellevue staff took note of PLAINTIFF'S obvious cognitive deficits, even though he had not been admitted for that reason. Dr. Tanping Wong wrote, after interviewing PLAINTIFF on May 25, 2011, that he had "significant cognitive deficits" and was "unable to provide details of his medical history." *Id*. at 5. A social worker, Maria Pogrebnaya, classified him as "Altered Mental Status/Dementia," explaining that PLAINTIFF was "lethargic and confused on [her] assessment." *Id*. at 9; *see also* Exhibit G, May 26, 2011, at 9 ("[Patient] is confused and appeared lethargic on my assessment.")

43.     Doctor Lakshmi Tummala examined PLAINTIFF the day after the examinations by Dr. Wong and Ms. Pogrebnaya. Exhibit G, May 26, 2011, at 7. The first item in the assessment plan, according to Dr. Tummala, pertained to PLAINTIFF'S presenting complaint of chest pain. *Id*. at 6. The second item was "Dementia," which was "suspect[ed] based on poor recall/confusion, likely vascular [versus] Alzheimer's." *Id*. The entry included an order for a mini-mental status examination ("MMSE") and blood tests for detecting dementia etiology, with possible treatment for Alzheimer's disease. *Id*. The attending physician, Dr. Natalie Levy, assessed PLAINTIFF as

---

[7] Exhibit G includes records from May 25, 26, and 27 (Discharge Summary), 2011. Citations within Exhibit G are to date and page number within the dated report.

suffering from "mild dementia," agreed that an MMSE and blood tests were in order, and added a non-contrast head CT scan to the testing regimen. *Id*. at 7. The Discharge Summary, signed by Dr. Tummala and Dr. Levy, states that PLAINTIFF was "unable to provide much history" "[w]ith respect to MS [mental status]." Exhibit G, Discharge Summary, at 1. Although PLAINTIFF was unable to complete the MMSE (he "stopped trying halfway through"), the doctors were nonetheless able to conclude that his score was "definitely less than 20," suggesting mild dementia.[8] *Id*.

44.      A non-contrast CT scan of PLAINTIFF'S head showed the presence of "extensive white matter disease mostly in frontal and temporal lobes, raising question of frontotemporal dementia [versus] Alzheimer's [versus] vascular dementia." *Id*. at 1-2. PLAINTIFF was started on Aricept [used to treat dementia] and discharged with an order for outpatient neurology follow-up care "for etiology of dementia." *Id*. at 2. Consistently, an 18-b Panel forensic psychiatry expert later determined that PLAINTIFF had been suffering from dementia for several years. *See* Exhibit H, C.P.L. § 440 Motion (excerpt), at 19-20.

45.      Although these observations and test results alerted the hospital that PLAINTIFF had substantial cognitive deficits, the hospital and its personnel did not alert the District Attorney's Office, the defense, or the court to their observations and conclusions. Certainly, however, NYDOC was on notice of PLAINTIFF's condition, having received PLAINTIFF with the recommended neurology follow up and Aricept prescription, and they too did not notify the District Attorney's Office, the defense, or the court.

46.      Although case law holds that information in the possession of hospitals that care

---

[8]      An individual with a score between 20-24 suggests mild dementia whereas a score of 13-20 suggests moderate dementia. *See* Alzheimer's Association, *Medical Tests*, available at https://www.alz.org/alzheimers-dementia/diagnosis/medical_tests (last viewed Apr. 10, 2022).

for pretrial inmates is not imputed to the District Attorney's Office for purposes of *Brady v. Maryland* disclosures, Defendant CITY OF NEW YORK has a duty to train hospitals that care for pretrial detainees to report information in their possession relevant to the guilt or innocence of pretrial detainees to appropriate parties, including the District Attorney's Office and/or defense counsel and/or the court. This is particularly so considering that, as DEFENDANT CITY OF NEW YORK well knows, more than half of pretrial detainees in Rikers Island have mental disabilities.

47. On information and belief, during the relevant time period no such training or direction had been given to these hospitals by DEFENDANT CITY OF NEW YORK.

## THE GUILTY PLEA

48. On March 15, 2012, PLAINTIFF appeared in the Supreme Court of the State of New York, Kings County (Foley, J.S.C.). PLAINTIFF was still incarcerated at that time.

49. PLAINTIFF was represented by Paul Liu from the Legal Aid Society. Assistant District Attorney Allegra Santomauro appeared for the People.

50. The People informed the Court that the offer was second-degree rape and "four years of jail." Exhibit I, Plea Transcript, at 2.

51. The Court gave PLAINTIFF the option of pleading to count one (act occurring between September 1, 2010, and October 31, 2010) or count three (act occurring between January 1, 2011, and January 31, 2011), the only difference being the date. *Id*. at 3. PLAINTIFF chose to plead guilty to count one. *Id.*

52. The Court advised PLAINTIFF that defense counsel had just represented that he (PLAINTIFF) wished to withdraw his plea of "not guilty" and enter a plea of "guilty" to second-degree rape, and asked, "[I]s that what you wish to do?" *Id.* at 6. PLAINTIFF replied, "*Well, I*

*really didn't rape nobody. Yes, ma'am.*" *Id.* (emphasis added) The Court responded by asking again, "Is that what you wish to do? You wish to plead guilty?" *Id.* This time, PLAINTIFF simply replied, "Yes." *Id.*

53.     When the Court then asked PLAINTIFF whether anyone had "threatened or coerced you in any way to get … you to take that plea?" he responded, "Well I don't know what to say." *Id.* at 6-7. When the question was repeated PLAINTIFF answered, "No." *Id.* at 7.

54.     The Court asked PLAINTIFF if he did "engage in sexual intercourse with … [A.]," *id.* at 8, to which PLAINTIFF replied, "Yes." *Id.* The Court asked PLAINTIFF if A. "is incapable of consent by reason of mental disability or mental incapacity," *id.*, and PLAINTIFF replied, "Yes." *Id.*

55.     The Court and the Assistant District Attorney agreed to accept PLAINTIFF'S plea, notwithstanding that PLAINTIFF was obviously incompetent to state, and to establish for purposes of the plea, the essential element that A. was "incapable of consent by reason of mental disability or mental incapacity."

56.     The Court and the Assistant District Attorney agreed to accept PLAINTIFF'S guilty plea, notwithstanding that PLAINTIFF was no more or less competent than A.; if they were capable of consenting and did so, then there was no rape. If A. was incapable of consenting, then neither was PLAINTIFF given his analogous level of deficit, in which case neither could be charged under P.L. § 130.30(2). *See People v. Dean*, 70 A.D.3d 1193, 1194 (3d Dep't. 2010) (reversing conviction and dismissing indictment on similar facts); *see also* Exhibit A1, Internal CRU Report, at 13 ("Accepting the fact that the defendant had sexual relations with A., the affirmative defense that was available to the defendant would excuse the defendant's conduct if, at the time of the crime, he "did not know the facts or conditions responsible for such incapacity

to consent" (P.L. § 130.10[1]). Thus, not only would the defendant's likely mental deficiencies be relevant, but also A.'s conduct may have contributed to the defendant's failure to recognize A.'s inability to consent.")

57.     The Court and the Assistant District Attorney agreed to accept PLAINTIFF'S guilty plea, notwithstanding that neither knew anything about A.'s ability to consent to sex other than her mental impairment, the extent of which had not been determined, and notwithstanding that "[t]he law does not presume that a person with mental retardation is unable to consent to sexual intercourse, and proof of incapacity must come from facts other than retardation alone."[9]

58.     Following entry of the guilty plea, the matter was adjourned to March 26, 2012, for sentencing. *See* Exhibit I, Plea Transcript, at 10.

## THE SENTENCING

59.     On March 26, 2012, PLAINTIFF appeared for sentencing. Although the sentencing proceeding occurred only 11 days following his plea, PLAINTIFF expressed confusion regarding the meaning of ten years' post-release supervision. *See* Exhibit J, Sentencing Transcript, at 3-4.

---

[9]     "Our jurisprudence recognizes certain limitations on the ability of a legally incapacitated person to consent to participate in sexual relations" and "[t]hat limitation is an exercise of the [s]tate's *parens patriae* interest, involved only where the individual is deemed unable to make a competent decision concerning a fundamental right." *People v. Cratsley,* 86 N.Y.2d 81, 86 (1995) (*citing Rivers v. Katz*, 67 N.Y.2d 485, 496 (1986)). The burden to establish legal incapacity in such regard is "a high one" as "[t]he law does not presume that a person with mental retardation is unable to consent to sexual intercourse, and proof of incapacity must come from facts other than retardation alone." *Id.* at 86; *see also People v. Easley,* 42 N.Y.2d 50, 54 (1977)(Court declined to "adopt the fiction that all persons are mentally or judgmentally equal" because "[a]s do all others, the mentally aberrant differ from one another in greater or lesser degree[,]" and thus "[c]rucial to a determination [of whether the individual is capable of consent] may be how such a person actually functions in society.") A relevant consideration is whether the encounter was primarily exploitative of the victim since that is "the type of harm the law most seeks to guard against by this provision." *Id*. at 88.

14

Following an off-the-record conversation between defense counsel and PLAINTIFF, defense counsel told the Court that PLAINTIFF inquired of him whether "he could get a sentence of three years." *Id.* at 4. The Court responded, "No. The promise is four plus ten? Four years in jail plus ten years' parole supervision. That is what I told you on the last date…. What changed?" *Id.* In response to the Court's query, PLAINTIFF said, "I'm kind of surprised." *Id.* Nonetheless, the Court then imposed the agreed-upon sentence of four years, plus ten years' post-release supervision. *Id.* at 5. A final order of protection was entered prohibiting any contact between PLAINTIFF and A. until 2034, *id.*, which essentially precluded any relationship he would otherwise have had with his child, F.

60.     PLAINTIFF initially appealed his conviction to the Appellate Division, Second Department, but thereafter moved the Court, as discussed below, for an order deeming his appeal dismissed following vacatur of the conviction.

## POST-CONVICTION INCARCERATION AND RELEASE

61.     During his post-conviction incarceration, PLAINTIFF, 65 years old at that time, was abused by some of his fellow inmates. Among other things, PLAINTIFF was required to eat spoiled food cooked by one of the inmates, was exposed to violence such as watching an inmate get stabbed to death, and suffered numerous other indignities including verbal denigrations by other inmates in sex-offender treatment because PLAINTIFF Broomes would not admit his relationship with A. was non-consensual. He reported other incidents but was unable to provide any specific details due to his dementia. These and other indignities exacerbated the stressors associated with PLAINTIFF's belated understanding that his conviction exposed him to mandatory deportation to Barbados, a country he had not lived in for over 40 years.

62.     PLAINTIFF was conditionally released from prison September 26, 2014.

63.     Following his release, PLAINTIFF was placed under post-release supervision prohibiting him, among other things, to travel outside New York or to remain outside after 8 P.M. The latter restrictions were imposed consequent to SORA. As a result, PLAINTIFF was unable to attend important family gatherings and events.

## POST-CONVICTION INVESTIGATION AND EXONERATION

64.     In July of 2015, PLAINTIFF'S new assigned counsel filed a motion to vacate and dismiss his conviction pursuant to C.P.L. § 440.10(1)(h), arguing, in relevant part, that PLAINTIFF was innocent of any criminal conduct because sex between two mentally disabled people is not, in and of itself, a crime, and that his guilty plea was unknowing, unintelligent, and involuntary. *See* Exhibit H, C.P.L. §440 Motion (excerpt), at 2.[10]

65.     The People did not respond to the motion. Instead, the CRU took the case under consideration, conducting an extensive investigation that included evaluations of PLAINTIFF and the Complainant A., interviews with Mrs. Broomes and PLAINTIFF'S former defense attorney Paul Liu from the Legal Aid Society, and a reexamination of the relevant files and records in the case. During this time, the motion was marked off-calendar.

66.     On May 23, 2019, before the Hon. Matthew D'Emic, counsel renewed the motion to vacate the conviction under C.P.L. § 440.10(1)(h), on the grounds that (a) the plea was unknowing, unintelligent, and involuntary, and (b) PLAINTIFF was deprived of the effective

---

[10]     Counsel was appointed to represent Mr. Broomes on his direct appeal, but as counsel related in her affidavit in connection with the § 440.10 motion, his cognitive deficits were so obvious that she instead filed a § 440.10 motion; filing a § 440.10 motion was also a procedural expedient to avoid his deportation upon release from confinement. *See* Exhibit H, 440 Excerpt, at 23-24 (¶¶ 69- 75).

assistance of counsel. The grounds for the § 440.10(1)(h) motion were supported by the CRU's

investigation, and Justice D'Emic granted it. The People then moved to dismiss the Indictment,

arguing that PLAINTIFF was himself likely intellectually disabled at the time of the offense and

thus unable to determine A.'s ability to consent to sexual intercourse, and that PLAINTIFF was

deprived of the effective assistance of counsel. The CRU also concluded that PLAINTIFF'S plea

was involuntary, explaining:

> We've also determined that it is likely because of the intellectual deficits and the
> progressive illness that PLAINTIFF was suffering at the time, that his plea was
> involuntary and that he did not understand the various rights that he was waiving
> or in fact even the nature of the charges.

Exhibit K, Justice D'Emic Order, at 7.

67.     Justice D'Emic granted the motion to dismiss. *Id*. at 9.

68.     PLAINTIFF'S appellate counsel, who represented PLAINTIFF throughout the

proceedings leading to the dismissal, added:

> For the past few years PLAINTIFF'S life has been torn apart. Even now he isn't
> accorded the dignity that most of us take for granted because of this conviction
> that should have never -- that should have never been. His family was torn apart.
> He was separated from his child that he was not allowed to have contact with

*Id*. at 9-10.

69.     In May 24, 2019, PLAINTIFF was removed from the Sex Offender Registry.


### THE CRU REPORT

70.     As was determined by the District Attorney, Kings County, in its July 9, 2020,

report titled *426 Years: An Examination of Wrongful Convictions In Brooklyn, New York*, ("the

CRU Report", Exhibit A) responsibility for this travesty of justice lay squarely at the feet not only

of inept defense counsel but also, among others, the NYPD and the Kings County District
Attorney's Office:

> The CRU found that [Broomes'] defense counsel failed to develop and then make
> any argument along these lines. But the CRU determined that law enforcement and
> the court also shared some blame. <u>The detective interviewing [Broomes] either did
> not detect B[rooms]'s mental disability or failed to inform the prosecution of it.</u> The
> prosecution failed to make inquiries about the defendant from readily available
> sources or conduct meaningful investigation which would have shed further light
> on his disability. And both the prosecution and the court failed to recognize and
> adequately address instances during [Broomes'] allocution and sentencing that
> suggested issues with his mental status.

Exhibit A, CRU Report, at 30 (emphasis added).

71.     The CRU Report "specifically faulted prosecutors for not scrutinizing or
investigating reliability issues before proceeding with the prosecution." *Id*. at 61.

72.     These findings, as well as the candid acknowledgments by the People when they
agreed to dismiss the charges against PLAINTIFF are binding on DEFENDANT CITY OF NEW
YORK.

73.     Moreover, the DEFENDANT CITY OF NEW YORK and the KCDAO bear
responsibility for what has befallen PLAINTIFF because, *inter alia*, they acted with deliberate
indifference to PLAINTIFF'S constitutional rights by failing to properly train its police officers
and Assistant District Attorneys to recognize and report obvious cognitive deficits and other
mental health issues among suspects and defendants.

74.     Moreover, DEFENDANT CITY OF NEW YORK bears responsibility for what has
befallen PLAINTIFF because they acted with deliberate indifference to PLAINTIFF'S
constitutional rights by failing to properly train Bellevue Hospital and Bellevue Hospital personnel
to document and report obvious instances of possible incapacity among those whom they treat
while detained in New York City jails, a failure that is particularly egregious given that, as

DEFENDANT CITY OF NEW YORK well knows, more than half of such pretrial detainees in Rikers Island have a mental health problem. *See* City of Canton, *Ohio v. Harris*, 489 U.S. 378, 392 (1989). As has been reported:

> The slow rollout of the so-called Program to Accelerate Clinical Effectiveness (PACE) comes as 52% of the entire population at the island lock up has been diagnosed with some type of mental illness, according to jails data from late last year – or an estimated 2,728 people "known to mental health" as of Monday.[11]

75.     In fact, as reported by National Public Radio in 2011, "the three largest inpatient psychiatric facilities in the country are jails: Los Angeles County Jail, Rikers Island Jail in New York City and Cook County Jail in Illinois."[12] (emphasis added).

76.     Statistics maintained by the Department of Health and Mental Hygiene and Brooklyn Mental Health Court revealed that among Brooklyn Mental Health Court participants between 2002-2006, 6.5% suffered from "Brain impairment", 2.4% suffered from a developmental disorder, and 0.7% suffered from either "Delirium, dementia, amnesic, and other cognitive disorders."[13] To be included in the cited study, the detainee must have been "detained in jail (Rikers

---

[11]     *See* Reuvaen Blau, *New Psych Units at Rikers Delayed Despite Renewed Focus on Mental Health and Justice*, published in *THE CITY*, March 28, 2022, available at: https://www.thecity.nyc/2022/2/28/22955601/new-psych-units-at-rikers-delayed-despite-renewed-focus-on-mental-health-and-justice; *see also* Courtney Gross, *Barred Medicine: Health Care on Rikers Island*, Gotham Gazette, published online Feb. 11, 2008, available at: *https://www.gothamgazette.com/index.php/health/3878-barred-medicine-health-care-on-rikers-island* ("About a quarter are mentally ill, according to the health department, and a third are seen as extremely frail, plagued by severe drug addictions or chronic illnesses."); *Brad H. v. City of New York*, 185 Misc. 2d 420, 423 (Sup. Ct.), aff'd, 276 A.D.2d 440 (1st Dep't 2000) ("In 1998, there was a total of 129,998 inmates in those jails. In 1997, about 33,000 prisoners, which was about 25% of the total, received mental health treatment in the New York City jails.")

[12]     *Nation's Jails Struggle With Mentally Ill Prisoners*, NPR National News, September 4, 2011 (emphasis added). Viewable at: https://www.npr.org/2011/09/04/140167676/nations-jails-struggle-with-mentally-ill-prisoners.

[13]     *See Criminal Justice Interventions for Offenders with Mental Illness: Evaluation of Mental Health Courts in Bronx and Brooklyn, New York*, Urban Institute, published February 28, 2012, available at https://www.ojp.gov/pdffiles1/nij/grants/238264.pdf (page 75).

Island) awaiting disposition." The records provided by a Department DEFENDANT CITY OF NEW YORK reflects that the City was aware that about 10% of pre-trial detainees at Rikers suffered from serious cognitive disabilities:

> The DOHMH provided data on all persons who were arrested in Brooklyn or the Bronx during 2005 and 2006 who were sufficiently mentally ill to receive services under the terms of the Brad H settlement (i.e., persons deemed or designated as eligible for Brad H discharge planning services). UI received basic demographic data, including: age at arrest, arrest date and jail admission data, release information, mental health status (i.e., Axis I and II diagnoses, as well as measures of functional status and the severity of illness), and mental health assessment and discharge planning service dates.

*Id*. at 39.

77.     Such cognitive illness or impairment is known by the City to be relevant to the criminal responsibility of many of these impaired detainees. *See e.g., People v. Villanueva*, 139 Misc. 2d 751, 754 (N.Y. Co. Sup. Ct. 1988) (People concede defendant's dementia rendered him incompetent); *People v. Schaffer*, 86 N.Y.2d 460, 463 (1995) (noting People's concession in trial court that defendant's dementia rendered him incompetent).[14]

78.     The police have a general responsibility pursuant to *Brady v. Maryland* and other law to inform appropriate persons in the District Attorney's office when they become aware that an arrestee has such an impairment.

79.     Incumbent, therefore, upon DEFENDANT CITY OF NEW YORK was to adequately train members of the New York City Police Department to recognize and report evidence of mental illness and/or cognitive impairment among arrestees and detainees.[15]

---

[14]     *See generally* Michael Hogan, PhD, et al., *New York State/ New York City Mental Health Criminal Justice Panel Report and Recommendations*, published June 2008, available at, https://omh.ny.gov/omhweb/justice_panel_report/report.pdf

[15]     *Id*. at 9 (" Recommendations: … Improve Training for 911 Call Takers and Dispatchers – NYS should create and refer to the NYS 911 Board a training protocol for 911 dispatchers to elicit information about whether a person involved in an incident has a history of mental illness."). This

80.    DEFENDANT CITY OF NEW YORK was deliberately indifferent to its responsibilities under *Brady* and other applicable law to train members of the NYPD to recognize and report evidence of mental illness and/or cognitive impairment among arrestees.

81.    Additionally, DEFENDANT NEW YORK CITY turned a blind eye to its responsibilities under *Brady*, repeatedly and as a matter of custom and practice, ignoring the failure of New York City Police Department employees to report *Brady* material.

82.    For example, on information and belief, no training or guidance appears in the New York City Police Department Patrol Guide or elsewhere pertaining to recognizing and reporting mental illness and/or cognitive impairment among suspects and detainees even though the Guide addresses other issues regarding persons with disabilities including issues pertaining to communication, mobility, and lodging.

83.    The aforementioned policymaking officials had notice during the relevant time period of the need to properly instruct, train, supervise and/or discipline employees with regard to their constitutional obligations based upon, among other circumstances:

    a.  numerous credible allegations, many substantiated by judicial decisions, that police officers had wrongfully withheld, lost, or destroyed evidence favorable to the defense that they had been required to timely disclose to the prosecution or the defense under Brady and *Rosario* (*see* Ex. L, appended hereto and incorporated herein by reference, listing some of those judicial decisions);

    b.  numerous civil lawsuits, some of which resulted in substantial civil settlements, alleging that police had falsified, exaggerated, or withheld evidence, thereby improperly causing unlawful injuries to individuals suspected of crimes (*see* Ex. M, appended hereto and incorporated herein by reference, listing some of those lawsuits);

    c.  numerous decisions of the United States Supreme Court, the United States Court of Appeals for the Second Circuit, the New York Court of Appeals, and the New York

---

also would apply to the New York City Department of Probation. *Id*. at 29 ("Pre-sentence investigations conducted by NYC DOP should include a brief, validated mental health screen, to allow DOP to alert judges about defendants who may need a more in-depth clinical assessment and may benefit from treatment-based alternatives or special probation conditions."). Here, by contrast, probation did not even have the list of medication, which presumably included Aricept, used exclusively for dementia. *See* Exhibit N, Pre-Sentence Report, at 4.

      Appellate Division, discussing the difficult issues that regularly arise under the Brady rule;

d. judicial decisions directly criticizing the NYPD for failing to train and supervise officers in their Brady obligations and for failing to adopt adequate Brady disclosure policies, *see Carter v. Harrison,* 612 F.Supp. 749 (E.D.N.Y.1985) (McLaughlin, D.J., adopting the Report and Recommendation of then-Magistrate Shira A. Scheindlin), and putting the NYPD on notice that the City could be held liable for its failure to adequately train police officers and investigators regarding their Brady and truth-telling obligations, *see Walker v. City of New York,* 974 F.2d 293 (2d Cir.1992), and *Carter v. Harrison, supra;*

e. the report dated July 7, 1994, following highly publicized hearings, of a blue-ribbon New York City investigation into police misconduct known as the "Mollen Commission," and

f. the inherent obviousness of the need to train, supervise and discipline police officers in such obligations to counteract the pressure on officers to close cases and to obtain convictions and the powerful incentives they have to ignore, discard, fail to record, and fail to disclose evidence favoring a criminal suspect or defendant.

      84. Had the NYPD and Bellevue Hospital been properly trained, and had they brought PLAINTIFF'S incapacities to the attention of the District Attorney's office or defense counsel, not only would PLAINTIFF more likely have benefited from the full defense that such information would have provided, but also, as the CRU Report found, PLAINTIFF would more likely have either avoided pretrial detention or, if detained, could have been provided special protection that would have averted what befell him in custody:

      Apart from being a potential full defense to the crime, evidence of [Broomes'] intellectual disability could have supported an attempt to obtain lower bail, to obtain special treatment or special services in jail, or to convince the prosecution or the court to offer a better plea disposition.

Exhibit A, CRU Report, at 69 n.204.

      85. Proper training for NYPD in the detection of developmental disabilities and other mental/intellectual infirmities could have protected PLAINTIFF from supposedly waiving his Miranda rights because, as the CRU also noted,

      Though not essential to the CRU's conclusion, Dr. Paradis told the CRU that given the defendant's intellectual disabilities, it is likely that he did not meaningfully understand the standard Miranda warnings read from the standard NYPD Miranda

warnings card/sheet, unless the detective gave the defendant a simplified version of the warnings, which are given to a juvenile offender. The investigation does not show that simplified warnings were given to the defendant. Had all this information been known to the defense, it might have had a compelling argument in support of a motion to suppress the defendant's statement.

Exhibit A1, Internal CRU Report, at 12, n.20.

86.     PLAINTIFF's admission was critical to the prosecution because it was the only evidence connecting PLAINTIFF to those counts alleging PLAINTIFF had sex with A. between September and October 2010. Indeed, the complaint upon which PLAINTIFF was arraigned made no mention of sexual conduct occurring in January, just September-October 2010. And, the undisclosed note in the prosecution file — that A.'s medical condition caused memory loss and that she could not recall ever sleeping with PLAINTIFF between September-October 2010 — suggests DEFENDANT PARIBELLO falsified A.'s statement that she had sex with PLAINTIFF during this time. Additionally, A.'s condition and resulting medical loss created the real possibility that she did not "remember" that her sexual relations with Mr. Broomes were consensual.

87.     DEFENDANT CITY OF NEW YORK and the KCDAO were on notice, prior to 2011, that *Brady*, Giglio and their progeny required the People to timely disclose to the defense that A. suffered from debilitating cognitive and medical conditions that compromised her memory and impaired her ability to accurately relate past events.

88.     DEFENDANT CITY OF NEW YORK'S deliberate indifference to the constitutional rights of inmates, and its custom, pattern and practice of ignoring and otherwise denying these same rights to pretrial detainees and others criminally charged is reflected as well in the New York City and New York State's promulgation of rules to protect persons other than criminal justice detainees and criminal defendants in analogous circumstances. For example,

certain professionals such as doctors, nurses, teachers, police officers, and childcare center workers are mandated to report suspected child abuse and neglect to a central registry.

89.     Likewise, any person, including a physician or medical facility manager, tending to, or caring for a non-armed forces person who has a gunshot, bullet, knife, sharp object, or powder burn wound is responsible for reporting the injury to law enforcement officials.

90.     Additionally, Health care providers in New York City are required to report certain diseases and conditions to the Health Department.

91.     And the DEFENDANT CITY OF NEW YORK requires the prompt reporting of drowning, falls from windows, animal bites, certain instances of food poisoning, poisoning by drugs and other toxic agents, and other hazards.

92.     In fact, within 24 hours of diagnosis, city hospitals must report online through Reporting Central[16] the first hospital admission of people ages 18 to 30 who are diagnosed with: Schizophrenia (any type), Psychosis NOS (not otherwise specified), Schizophreniform Disorder, Delusional Disorder, Schizoaffective Disorder, Brief Psychotic Disorder, Shared Pyschotic Disorder, or other schizophrenia spectrum or other psychotic disorder. Indeed, mental health facilities or programs receiving state funding "must provide to the state Office of Mental Health any records pertaining to persons who may be disqualified from possessing a firearm due to mental illness." N.Y. Mental Hyg. Law §§ 7.09(j), 31.11, 33.13(b).

93.     The existence of such reporting requirements, publicized on New York City websites,[17] reflects a recognition by DEFENDANT CITY OF NEW YORK that reporting

---

[16]     *See Reporting Diseases and Conditions*, NYC Health, last accessed Apr. 11, 2022, available at, https://www1.nyc.gov/site/doh/providers/reporting-and-services/notifiable-diseases-and-conditions-reporting-central.page.

[17]     *See, e.g.,* NYC Children: Mandated Reporters, available at, https://www1.nyc.gov/site/acs/child-welfare/mandated-

requirements are essential to assure that New York residents are protected against abuse, yet DEFENDANT CITY OF NEW YORK demonstrated its deliberate indifference to, and its custom, pattern and practice of ignoring the analogous concerns of pretrial detainees and others charged with criminal offenses by not training police, Assistant District Attorneys and others within its charge that participate in the criminal justice system, to recognize and report to the appropriate authorities the mental disabilities of arrestees, and not imposing similar requirements on New York City Hospitals — particularly Bellevue Hospital Prison Ward — that treat pretrial detainees and other criminally charged individuals.

94.     DEFENDANT CITY OF NEW YORK was aware of the need to screen persons in its charge for the existence of mental illness evidenced by a 1991 New York City Charter Rule, 40 RCNY § 2-02, requiring "Screening for mental and emotional disorders … be performed on all inmates before they are placed in general population. This initial screening shall take place within twenty-four hours after an inmate's arrival at the correctional facility." Relatedly, when a detainee is "identified as developmentally disabled," and the facility concludes incarceration is counterintuitive to treatment, it must notify the court. 40 RCNY § 2-04(c)(6)(ii); *see also* RCNY § 3-04 (screening incoming inmates for medical conditions).

95.     Since 2003, DEFENDANT CITY OF NEW YORK required, pursuant to the Brad H settlement, that "all admissions to Rikers Island are screened for mental illness (e.g., those

---

reporters.page#:~:text=Certain%20professionals%20such%20as%20doctors,State%20Central%20Register%20(SCR); https://www1.nyc.gov/site/doh/providers/reporting-and-services/notifiable-diseases-and-conditions-reporting-central.page;
https://www1.nyc.gov/site/doh/providers/reporting-and-services/notifiable-diseases-and-conditions-reporting-central.page

defendants who were remanded to custody after arraignment)."[18] The Brad H settlement required the City to provide post-release services to qualifying detainees. It bears highlighting that "From 2009 through 2012, health department spending on mental health services in the city's jails remained flat, at about $35 million a year. Over that same period, the number of inmates with mental health diagnoses increased by nearly 10 percent, to more than 20,200 admissions in 2012 and comprised a larger share of the inmate population."[19] PLAINTIFF was incarcerated during this period.

96.     Further, and following a similar report published in 1979,[20] DEFENDANT CITY OF NEW YORK, in 1993, after a settlement reached between a class of pre-trial detainees, instituted pre-arraignment screening units ("PASU") in New York City Courts to detect health needs of all people awaiting arraignment. A 2017 Report conducted by, *inter alia*, New York City Health + Hospitals' Division of Correctional Health Services, remarked the PASU in Kings County was inadequate insofar as its staff did not consist of qualified medical professionals,[21] the

---

[18]     *See Criminal Justice Interventions for Offenders with Mental Illness: Evaluation of Mental Health Courts in Bronx and Brooklyn, New York*, Urban Institute, published February 28, 2012, available at https://www.ojp.gov/pdffiles1/nij/grants/238264.pdf (page 76).

[19]     *See Looking Back at the Brad H. Settlement: Has the City Met Its Obligation to Provide Mental Health & Discharge Services in the Jails?*, New York City Independent Budget Office, published May 2015, available at https://www.ibo.nyc.ny.us/iboreports/looking-back-at-bradh-settlement-has-the-city-met-obligation-to-provide-mental-health-discharge-planning-2015.html

[20]     The need for qualified medical staff to assess pre-trial detainees, and ensure communication between treating staff and relevant agencies and the courts was first advanced in a 1979 report prepared by the NYC Board of Corrections, which was submitted to Mayor Ed Koch. *See*          *https://www1.nyc.gov/assets/boc/downloads/pdf/Meetings/pre-2017/1979-Deceember-Report-to-the-Mayor.pdf* at 18 ("The process for classifying and referring disturbed inmates is inadequate on several grounds … First, if the classification system is to serve as the basis for substantive decisions and is to be operationally sound, it must be supported by mental health staff, custodial staff and receiving units outside the Department of Correction. Toward these ends, the planning of the system must include active participation by all involved agencies.")

[21]     *See* David Cloud et al., *The Enhanced Pre-Arraignment Screening Unit Improving Health Services, Medical Triage, and Diversion Opportunities in Manhattan Central Booking*, Vera Institute     of     Justice,     published     online     Sept.     2017,     available     at,

screening staff lacked access to health records, and the PASU's had no means of communicating

with jails and medical facilities.[22] These inadequacies persisted notwithstanding a previous 2008

Report presented to, *inter alia*, Former NYC Mayor Michael Bloomberg, highlighting that the

"Limited capacity to share information within and between the mental health and criminal and

juvenile systems was also evident in the cases the Panel reviewed. Information sharing may have

helped both clinicians and criminal and juvenile justice professionals make more informed and

better decisions."[23]

97.     Post-arraignment, New York Corrections Law § 508 requires a pre-trial detainee

be transferred for mental health treatment whenever a "physician to a jail" certifies to the warden

or jailer that treatment is necessary to protect the detainee.

98.     During the KCDAO's prosecution of PLAINTIFF in 2012, New York's Legislature

enacted Social Service Law §§ 488-492, which imposes reporting requirements on custodians of

---

https://www.vera.org/downloads/publications/Enhanced-Pre-Arraignment-Screening-Unit-full-report.pdf, at p. 4 ("The original PASU model, still operating in Brooklyn … has several limitations. First, the EMTs who staff these units are neither credentialed nor equipped to diagnose or treat the most common ailments that people present in central booking"); *see also id*. at 8 (listing all the flaws with existing pre-screening system)

[22]     *Id*. ("PASUs' paper-based medical screening protocol is outdated, limited in scope, and requires EMTs to quickly determine people's health needs based solely on self-reports, with no access to health records. This system lacks a process for detecting the full range of health problems that are common among people encountering the justice system. Third, the PASU clinics are isolated from the rest of the city's public health infrastructure, including jail medical facilities. There is little or no communication between EMTs screening patients, clinicians conducting medical intakes on Rikers Island, and community providers. As a result, medical information the PASU EMTs collect is not typically used to ensure that people with health problems who are incarcerated after arraignment are swiftly triaged to the appropriate medical settings within the jail system.")

[23]     Michael Hogan, PhD, et al., *New York State/ New York City Mental Health Criminal Justice Panel Report and Recommendations*, published June 2008, available at, https://omh.ny.gov/omhweb/justice_panel_report/report.pdf at 20; *see also id*. at 26 ("Criminal justice and mental health data systems lack the ability to facilitate the cross sharing of information, regardless of whether that information is publicly available or made available through consent.")

incapacitated persons held at certain facilities, which include local correctional facilities like Rikers Island. *See* N.Y. Soc. Serv. Law § 488(4)(a).[24] When a custodian at a local correctional facility becomes aware of a "significant incident," defined as "an incident, other than an incident of abuse or neglect, that because of its severity or the sensitivity of the situation may result in, or has the reasonably foreseeable potential to result in, harm to the health, safety or welfare of a person receiving services," *see* N.Y. Soc. Serv. Law § 488(1)(i), the custodian must report, either by phone or electronic transmission, the risk to the "vulnerable person's central register," who must then immediately relay the information received "to the appropriate law enforcement agency or district attorney[.]"N.Y. Soc. Serv. Law § 492(3)(b).

99.    Although NYC Health and Hospital is not a City agency, the City of New York is responsible for the medical care afforded to detainees within its charge and thus "cannot shield [itself] from liability by delegating inmate medical care to third-party, private entities." *Gleeson v. Cnty. of Nassau*, No. 15CV6487AMDRL, 2019 WL 4754326, at *16 (E.D.N.Y. Sept. 30, 2019); *see also Gil v. Vogilano*, 131 F. Supp. 2d 486, 493 (S.D.N.Y. 2001) ("[A] municipality's duty to provide medical care to inmates is non-delegable and is not absolved by contracting with a third party to provide care.").

100.    Since 1966, it has been clearly established that due process is violated where someone who is legally incompetent is convicted of a crime. *See Pate v. Robinson*, 383 U.S. 375 (1966). Further, the government, be it state or municipal, must have procedures in place to detect potential incompetency among the accused because "it is contradictory to argue that a defendant

---

[24]    Although correctional facilities are exempted, *see* N.Y. Soc. Serv. Law § 488(4)(a), that definition applies to "Any place operated by the department [of corrections and community supervision]." N.Y. Correct. Law § 2(4)(a) (McKinney). By contrast, a "Local Correctional Facility" is "Any place operated by a county or the city of New York as a place for the confinement of persons … charged with crime[.]" N.Y. Correct. Law § 2(16)(a).

may be incompetent, and yet knowingly or intelligently 'waive' his right to have the court determine his capacity to stand trial." *Id*. at 384. A judge, of course, is not a trained medical professional capable of detecting mental illness, and so the need for municipalities, as the 1993 *Grubbs* Settlement and numerous NYC Regulations make clear, to detect and address mental health conditions among inmates is apparent.[25]

101.    Clearly, as early as 1979 and continuing through 1993 until the present, DEFENDANT CITY OF NEW YORK was aware to a moral certainty that its employees would encounter persons suffering from mental health conditions that had to be addressed to ensure the proper administration of justice. This undeniable fact and the attendant circumstances can be adequately addressed only through proper training of NYPD officers, NYDOC Staff (including Bellevue Hospital), Assistant District Attorneys, and those tasked with pre-screening inmates to detect mental health conditions among arrestees and inmates, to recognize and report relevant findings.

102.    When DEFENDANT CITY OF NEW YORK employees fail to detect and report mental health conditions the inevitable result is the violation of inmates' constitutional rights, including the Fourteenth Amendment right to the timely receipt of exculpatory evidence bearing on competency and related defenses.

103.    DEFENDANT CITY OF NEW YORK'S failure to properly train police, hospital personnel and Assistant District Attorneys to recognize and report such disabilities proximately caused the damages complained of in this Complaint.

---

[25]    *See e.g.,* Michael Hogan, PhD, et al*., New York State/ New York City Mental Health Criminal Justice Panel Report and Recommendations,* published June 2008, available at, https://omh.ny.gov/omhweb/justice_panel_report/report.pdf at 28 ("court officials have limited tools with which to access information that could help them assess whether a defendant has a mental illness.")

104.    DEFENDANT CITY OF NEW YORK also failed to adequately train prosecutors to disclose *Brady* material to criminal defendants, evidenced in this case by the withholding of the note stating that, in the grand jury, A. was only able to testify to having sex with PLAINTIFF in January even though PLAINTIFF was charged with sexual encounters occurring in between September and October 2010, the charge to which he plead guilty and als that she suffers from seizures which cause memory loss. Undoubtedly, in 2010, the DEFENDANT CITY OF NEW YORK was aware of its responsibility to adequately train and ensure prosecutors comply with *Brady* obligations, yet, by policy and practice failed to do so. *See Walker v. City of New York*, 974 F.2d 293, 300 (2d Cir. 1992) (reversing the dismissal of *Monell* claims against the City of New York that alleged that the Kings County District Attorney's office, in early 1970s, failed to adequately train its prosecutors to turn over exculpatory evidence); *Bailey v. City of New York*, 79 F. Supp. 3d 424, 439 (E.D.N.Y. 2015) (denying summary judgment on *Monell* claim alleging KCDA had policy of withholding *Brady* material in 2008-09); *Collins v. City of New York*, 923 F. Supp. 2d 462, 477 (E.D.N.Y. 2013) (denying motion to dismiss *Monell* claims against KCDA based on DA's lack of reprimand for *Brady* violations in 1994-95); *see also* Exhibit A, CRU Report, at 54 ("The most common type of withheld evidence was prior statements made by the prosecution's testifying witnesses."); Exhibit L, Criminal Cases, at 2-6 (collecting cases between 1985-2010 finding *Brady* violations by KCDA).

105.    Plaintiff seeks to recover monetary damages from the individual police detective who violated Plaintiff's constitutional rights in the NYPD's investigation of this case, and against the DEFENDANT CITY OF NEW YORK, pursuant to *Monell v. New York City Department of Social Services*, 436 U.S. 658 (1978), and other applicable law.

*** 

## FIRST CAUSE OF ACTION

(42 U.S.C. § 1983; Denial Of Due Process; Detective
Victor Paribello)

106.     PLAINTIFF repeats each and every allegation in this Complaint as though fully set
forth at length herein.

107.     DEFENDANT VICTOR PARIBELLO denied PLAINTIFF due process as
guaranteed by the Fourteenth Amendment to the United States Constitution by failing to bring to
the attention of the District attorney's office, as had to have been obvious from his interviews with
PLAINTIFF and others, that PLAINTIFF was cognitively impaired and, for this reason among
others, may not be guilty of rape.

108.     DEFENDANT VICTOR PARIBELLO denied PLAINTIFF due process by failing
to bring to the attention of the District Attorney's office that A. had admitted she had claimed Mr.
Broomes raped her because she was afraid to acknowledge their relationship was consensual.

109.     DEFENDANT VICTOR PARIBELLO denied PLAINTIFF due process by failing
to inform the District Attorney's office that either A. was unable to recall when she had sex with
PLAINTIFF or that the only encounter with PLAINTIFF BROOMES she recalled was in January
2011.

110.     By his actions DEFENDANT VICTOR PARIBELLO, under color of law, deprived
PLAINTIFF of the rights, privileges, and immunities secured by the Constitution and laws of the
United States.

111.    By reason of the foregoing, DEFENDANT VICTOR PARIBELLO is liable to PLAINTIFF, pursuant to 42 U.S.C. § 1983, for compensatory and punitive damages proximately caused by this violation of PLAINTIFF's rights.

**SECOND CAUSE OF ACTION**

(Monell/42 U.S.C. § 1983: Claim Against Defendant City of New York
For The Actions Of The NYPD)

112.    PLAINTIFF repeats each and every allegation in this Complaint as though fully set forth at length herein.

113.    Prior to Plaintiff's arrest, policymaking officials at DEFENDANT CITY OF NEW YORK and the NYPD, with deliberate indifference to the constitutional rights of individuals suspected of criminal activity and to the risk of arresting, prosecuting and convicting innocent people, elected not to provide members of the New York City Police Department with minimally adequate training (if any training at all) to detect and report apparent mental impairment of suspects and arrestees that may impact their guilt, and elected not to adopt minimally adequate policies, procedures, or standards, to train police officers to recognize and report apparent cognitive impairment of suspects and arrestees impacting their guilt, even though they knew to a moral certainty that constitutional rights were imperiled having been presented reports detailing said risks, and having entered into settlements recognizing these risks, and having been subject to both City and State laws reflecting the need to avoid such risks.

114.    In addition, NYPD policymaking officials instituted and implemented plainly inadequate policies, procedures, regulations, practices, customs, training, supervision, and discipline concerning the continuing duty of police investigators to preserve and to make timely disclosure to the District Attorney, during criminal investigations and prosecutions, of all material

evidence or information ("*Brady* material") favorable to a person suspected, accused or convicted of criminal conduct, including, but not limited to, evidence of innocence, evidence of the detainee's cognitive impairment, *Brady* material, evidence that an identifying witness and/or victim is unreliable, and evidence impeaching the credibility of prosecution witnesses, so that the District Attorney could comply with his or her constitutional obligation to disclose such information to the defense under *Brady*.

115.   The foregoing actions and inactions caused the violation of PLAINTIFF'S constitutional rights and resultant injuries complained of herein, which were directly, foreseeably, proximately, and substantially caused by conduct, chargeable to DEFENDANT CITY OF NEW YORK, resulting from an official municipal policy, and unofficial custom, and because DEFENDANT CITY OF NEW YORK was deliberately indifferent in its failure to train and supervise DEFENDANT VICTOR PARIBELLO and other members of the NYPD.

116.   The foregoing violations of PLAINTIFF'S federal constitutional rights and resultant injuries were further directly, foreseeably, proximately, and substantially caused by conduct, chargeable to DEFENDANT CITY OF NEW YORK, amounting to deliberate indifference to the constitutional rights of persons, including PLAINTIFF, who are investigated, arrested, or prosecuted for alleged criminal activities.

117.   Under the principles of municipal liability for federal civil rights violations, the City's Police Commissioner (or his authorized delegates), has final responsibility for training, instructing, supervising, and disciplining police personnel with respect to the investigation and prosecution of criminal matters, including constitutional requirements with respect to the use of identification procedures and the disclosure of *Brady* material to prosecutorial authorities or defendants.

118.    The Police Commissioner, personally and/or through his authorized delegates, at all relevant times had final authority, and constitutes a City policymaker for whom the City is liable, with respect to compliance by employees of the NYPD with the above-mentioned constitutional requirements.

119.    During all times material to this Complaint, the Police Commissioner of the NYPD owed a duty to the public at large and to PLAINTIFF, which he knowingly and intentionally breached, or to which he was deliberately indifferent, to implement policies, procedures, customs, practices, and training sufficient to deter and to avoid conduct by his subordinates violating the aforementioned constitutional rights including but not limited to the right to due process, of criminal suspects or defendants and of other members of the public.

120.    The aforesaid policies, procedures, regulations, practices and/or customs of Defendant City and the NYPD were collectively and individually a substantial factor in bringing about the aforesaid violations by DEFENDANT VICTOR PARIBELLO of PLAINTIFF'S rights under the Constitution and laws of the United States.

121.    By virtue of the foregoing, DEFENDANT CITY OF NEW YORK is liable for having substantially caused the foregoing violations of PLAINTIFF'S constitutional rights and his constitutional injuries.

### THIRD CAUSE OF ACTION

(Monell/42 U.S.C. § 1983: Claim Against Defendant City of New York
For The Actions Of The Kings County District Attorney's Office)

122.    PLAINTIFF repeats each and every allegation in this Complaint as though fully set forth at length herein.

123.     Prior to Plaintiff's arrest, policymaking officials at DEFENDANT CITY OF NEW YORK and the KCDAO, with deliberate indifference to the constitutional rights of individuals suspected of criminal activity and to the risk of arresting, prosecuting and convicting innocent people, elected not to provide members of the KCDAO and NYPD with minimally adequate training (if any training at all) to detect and report apparent mental impairment of suspects and arrestees that may impact their guilt, and elected not to adopt minimally adequate policies, procedures, or standards, to train police officers to recognize and report apparent cognitive impairment of suspects and arrestees impacting their guilt.

124.     Likewise, policymaking officials at DEFENDANT CITY OF NEW YORK and the KCDAO, with deliberate indifference to the constitutional rights of individuals suspected of criminal activity and to the risk of arresting, prosecuting and convicting innocent people, elected not to provide members of the KCDAO with minimally adequate training (if any training at all) to detect and report apparent mental impairment of victims alleged to be incapable of consent insofar as, at the time of Plaintiff's prosecution, it was clear that "the law  does not presume that a person with mental retardation is unable to consent to sexual intercourse, and proof of incapacity must come from facts other than retardation alone" *People v. Dean*, 70 A.D.3d 1193, 1194 (3d Dep't 2010).

125.     In addition, KCDAO policymaking officials (District Attorney Charles J. Hynes) instituted and implemented plainly inadequate policies, procedures, regulations, practices, customs, training, supervision, and discipline concerning the continuing duty of personnel within the KCDAO to preserve and to make timely disclosure during criminal investigations and prosecutions, of all material evidence or information ("*Brady* material") favorable to a person suspected, accused or convicted of criminal conduct, including, but not limited to, evidence of

innocence, evidence of the detainee's cognitive impairment, evidence that an identifying witness and/or victim is unreliable, and evidence impeaching the credibility of prosecution witnesses, so that the District Attorney could comply with his or her constitutional obligation to disclose such information to the defense under *Brady*. And despite dozens of court decisions, 56 of which are listed in Ex. L, finding that prosecutors had wrongfully failed to disclose evidence actually or potentially favorable to the defense that should have been disclosed under *Brady, Rosario,* or statutorily-mandated discovery procedures, or otherwise had engaged in conduct that misled the court, jury, and/or defense, none of the prosecutors involved were disciplined.[26]

126.    The foregoing actions and inactions caused the violation of PLAINTIFF'S constitutional rights and resultant injuries complained of herein, which were directly, foreseeably, proximately, and substantially caused by conduct, chargeable to DEFENDANT CITY OF NEW YORK, resulting from an official municipal policy, and unofficial custom, and because DEFENDANT CITY OF NEW YORK was deliberately indifferent in its failure to train and supervise employees of the KCDAO.

127.    The foregoing violations of PLAINTIFF'S federal constitutional rights and resultant injuries were further directly, foreseeably, proximately, and substantially caused by

---

[26]    During depositions in *Zahrey v. City of New York,* et al., 98 Civ. 4546 (DLP) (S.D.N.Y.), the former Chief of Investigations for Hynes, Dennis Hawkins, and Hynes's Counsel to the District Attorney, Dino Ameruso, acknowledged that there was no formal disciplinary procedures or policies and they were unaware of any ADA having ever been disciplined during Hynes's tenure for misconduct committed during the investigation or prosecution of criminal allegations. Further, the City Law Department acknowledged, with respect to a list of court decisions involving Brady and related violations, that no discipline had been imposed on any of the prosecutors. Hawkins admitted the Office had no written policy for disclosing Brady material. Hawkins and ADA Theresa Corrigan, who also gave a deposition, admitted that they were unaware of any specific training the Office provided on how to question or evaluate informant or accomplice witnesses. Finally, Hawkins testified that, despite having virtually daily contact with Hynes over many years, he had not once ever heard him discuss the training of ADAs in such areas.

conduct, chargeable to DEFENDANT CITY OF NEW YORK, amounting to deliberate indifference to the constitutional rights of persons, including PLAINTIFF, who are investigated, arrested, or prosecuted for alleged criminal activities.

128.     Under the principles of municipal liability for federal civil rights violations, the District Attorney of Kings County (or his authorized delegates), has final responsibility for training, instructing, supervising, and disciplining personnel within his office with respect to the investigation and prosecution of criminal matters, including constitutional requirements with respect to, among other things, recognizing the existence of, and the disclosure of, *Brady* material to defendants.

129.     During all times material to this Complaint, the District Attorney of Kings County owed a duty to the public at large and to PLAINTIFF, which he knowingly and intentionally breached, or to which he was deliberately indifferent, to implement policies, procedures, customs, practices, and training sufficient to deter and to avoid conduct by his subordinates violating the constitutional rights, including but not limited to the right to due process, of criminal suspects or defendants and of other members of the public.

130.     The aforesaid policies, procedures, regulations, practices and/or customs of DEFENDANT CITY and the KCDAO were collectively and individually a substantial factor in bringing about the aforesaid violations by the KCDAO of PLAINTIFF'S rights under the Constitution and laws of the United States.

131.     By virtue of the foregoing, DEFENDANT CITY OF NEW YORK is liable for having substantially caused the foregoing violations of Plaintiff's constitutional rights and his constitutional injuries.

**FOURTH CAUSE OF ACTION**

(Monell/42 U.S.C. § 1983: Claim Against Defendant City of New York
For The Actions Of Bellevue Hospital/NYCDOC)

132.     PLAINTIFF repeats each and every allegation in this Complaint as though fully set forth at length herein.

133.     Prior to Plaintiff's arrest, policymaking officials at DEFENDANT CITY, with deliberate indifference to the constitutional rights of detainees in criminal cases, elected not to adopt minimally adequate policies, procedures, or standards, to train hospital personnel to recognize and report apparent cognitive impairment of pretrial detainees impacting their competency and/or guilt or innocence.

134.     In addition, policymaking officials of DEFENDANT CITY OF NEW YORK instituted and implemented plainly inadequate policies, procedures, regulations, practices, customs, training, supervision, and discipline concerning the continuing duty of personnel within New York City hospitals, including Bellevue Hospital, to preserve and to make timely disclosure to the appropriate authorities within the criminal justice system when they become aware, in the performance of their duties, that a pre-trial detainee suffers from a medical condition or cognitive impairment that may be relevant to the detainee's competency and/or guilt or innocence.

135.     DEFENDANT CITY OF NEW YORK, at the time of PLAINTIFF's prosecution, was on notice that about a quarter of the inmates held at Rikers were mentally ill and a third were seen as extremely frail, plagued by severe drug addictions or chronic illnesses. *See* Courtney Gross, *Barred Medicine: Health Care on Rikers Island*, Gotham Gazette, published online Feb. 11, 2008, available at: *https://www.gothamgazette.com/index.php/health/3878-barred-medicine-health-care-on-rikers-island* ("About a quarter are mentally ill, according to the health department, and a

third are seen as extremely frail, plagued by severe drug addictions or chronic illnesses."). Likewise, DEFENDANT CITY OF NEW YORK was aware that developmental disabilities may cause false confessions and/or guilty pleas. *See Blackburn v. Alabama*, 361 U.S. 199 (1960); indeed, as early as 2001, Kings County created the Mental Health Court to "improv[e] the court system's ability to identify, assess, and monitor offenders with mental illness."[27] Further, DEFENDANT CITY OF NEW YORK had regulations in place requiring DOC officials to screen pre-trial detainees for mental health conditions upon arrival, and in the same year PLAINTIFF was sentenced, New York passed a law requiring local correctional facilities notify a "central register" who would then notify the "relevant district attorney" of significant events that has the reasonably foreseeable potential to result in, harm to the health, safety or welfare of a person receiving services. Clearly, then, not only was it known that the mentally ill were vulnerable, but also that a district attorney or law enforcement must be aware of certain events placing the detainee in harm. Yet by policy and practice, and through deliberate indifference the DEFENDANT CITY OF NEW YORK failed to protect the rights of pretrial detainees.

136.   While at Bellevue hospital, operated by or at the direction of DEFENDANT CITY OF NEW YORK, PLAINTIFF was diagnosed with dementia and was returned to Rikers Island with an Aricept prescription for treatment of his dementia. Recognizing that a large percentage of pretrial detainees have mental and/or cognitive disabilities that may impact their ability to understand the nature of the proceedings and/or to voluntarily enter a guilty plea, and recognizing that medical professionals such as those who treated PLAINTIFF are in the best position to identify pretrial detainees with such disabilities, DEFENDANT CITY OF NEW YORK had a duty, under principles of due process, to assure that when a diagnosis of such a disability is made it must be

---

[27] https://www.innovatingjustice.org/sites/default/files/BMHCevaluation.pdf

transmitted to the proper authorities, whether it be the prosecution the court or the defense. Yet, through pattern and practice and reckless disregard of its constitutional obligations it failed to create and/or implement such practices. This even though doctors are required, in other contexts, to report certain mental health conditions to appropriate authorities. *See Montgomery v. Cuomo*, 291 F. Supp. 3d 303, 307 (W.D.N.Y. 2018) (discussing Mental Health Law requiring "mental health professionals" submit to state-run database personal information of patient that professional believes poses a risk of harm for the purpose of alerting law enforcement so they can suspend or revoke firearm license)

137.    Those working in the prisons and/or hospitals often have more contact with pre-trial than anyone else in the criminal justice system; this circumstance and the expertise of medical professionals place them in a unique position to detect and report mental illness that may be directly relevant to a pretrial detainee's guilt or innocence, ability to understand the proceedings, and/or ability voluntarily enter a plea of guilty. However, DEFENDANT CITY OF NEW YORK, through policy and practice and/or through a deliberate indifference to the due process rights of pretrial detainees, had no training programs or policies in place requiring third-party contractors and/or DOC to report when a detainee was diagnosed or suffered from a medical  or cognitive disability relevant to the detainee's competence, ability to understand the proceedings, and/or guilt or innocence.

138.    The foregoing actions and inactions caused the violation of PLAINTIFF'S constitutional rights and resultant injuries complained of herein, which were directly, foreseeably, proximately, and substantially caused by conduct, chargeable to DEFENDANT CITY OF NEW YORK and the New York Health and Hospital Corporation, said injuries resulting from an official municipal policy, and/or unofficial custom, and because DEFENDANT CITY OF NEW YORK

was deliberately indifferent in its failure to train and supervise personnel of New York City hospitals including Bellevue Hospital.

139.     The foregoing violations of PLAINTIFF'S federal constitutional rights and resultant injuries were further directly, foreseeably, proximately, and substantially caused by conduct, chargeable to DEFENDANT CITY OF NEW YORK, amounting to deliberate indifference to the constitutional rights of persons, including PLAINTIFF, who are investigated, arrested, or prosecuted for alleged criminal activities.

140.     Under the principles of municipal liability for federal civil rights violations, the DEFENDANT CITY OF NEW YORK have final responsibility for training, instructing, supervising, and disciplining personnel within New York City hospitals, including Bellevue Hospital with respect to identifying and reporting to appropriate authorities evidence of cognitive impairment among its patients who are pretrial detainees that would ~~constitute *Brady*~~ be material to competence and/or guilt or innocence.

141.     The aforesaid policies, procedures, regulations, practices and/or customs of DEFENDANT CITY and the New York Health and Hospital Corporation were collectively and individually a substantial factor in bringing about the aforesaid violations of PLAINTIFF'S rights under the Constitution and laws of the United States.

142.     By virtue of the foregoing, DEFENDANT CITY OF NEW YORK is liable for having substantially caused the foregoing violations of Plaintiff's constitutional rights and his constitutional injuries.

## JURY TRIAL DEMAND

WHEREFORE, Plaintiff demands judgment against the Defendants as follows:

a)  For compensatory damages in an amount to be determined;

b)  For punitive damages against the individual Defendants in an amount to be determined;

c)  For reasonable attorneys' fees, together with costs and disbursements, pursuant to 42

U.S.C. §1988 and to the inherent powers of this Court;

d)  For pre-judgment interest as allowed by law; and

e)  For such other and further relief as this Court may deem just and proper.

Dated: New York, New York
       April 6, 2023

LEVITT & KAIZER

_____
By: Richard Levitt (RL 9177)
40 Fulton Street, 17th Floor
New York, New York 10038
(212) 480-4000
 rlevitt@landklaw.com

*Attorney for Plaintiff Livingstone Broomes*