UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
---------------------------------------------------------x
LIVINGSTONE BROOMES,

                Plaintiff,

       - against -

CITY OF NEW YORK, *et al.*,

                Defendants.
---------------------------------------------------------x

**MEMORANDUM & ORDER**
22-CV-2807 (PKC) (MMH)

PAMELA K. CHEN, United States District Judge:

Plaintiff Livingstone Broomes ("Plaintiff" or "Mr. Broomes") brings this action against the City of New York ("City") and Detective Victor Paribello ("Detective Paribello") (collectively, "Defendants"). Presently before the Court is Defendants' motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6) ("Rule 12(b)(6)"). For the reasons that follow, the Court grants in part and denies in part Defendants' motion.

**BACKGROUND**

I.     **Factual Allegations**[1]

Plaintiff, a resident of Kings County, New York, with an intellectual disability,[2] brings this

action after he "was wrongly arrested, prosecuted, convicted and punished for Rape in the Second

Degree, in violation of New York Penal Law § [130.30(2)],[3] in connection with *People v. Broomes*,

Kings County Indictment No. 3711/11, after having had sex with another person who also had

cognitive disabilities."  (Am. Compl., Dkt. 32 ("Am. Compl."), ¶ 2.)  On May 23, 2019, Plaintiff

was exonerated and his case dismissed after his newly-appointed lawyer filed a motion under New

---

[1] The following facts are derived from the Amended Complaint and the exhibits attached thereto. *See TileBar v. Glazzio Tiles*, No. 22-CV-3823 (PKC) (RML), 2024 WL 1186567, at *11 (E.D.N.Y. Mar. 15, 2024) ("[On a Rule 12(b)(6) motion,] in addition to the facts alleged in the complaint, the court may also consider documents that are appended to the complaint, incorporated in the complaint by reference, or integral to the complaint, as well as matters of which judicial notice may be taken." (citing *Goel v. Bunge, Ltd.*, 820 F.3d 554, 558–59 (2d Cir. 2016))).  The Court "accept[s] all well-pleaded allegations in the complaint as true, drawing all reasonable inferences in [P]laintiff's favor."  *Int'l Code Council, Inc. v. UpCodes Inc.*, 43 F.4th 46, 53 (2d Cir. 2022) (quoting *Operating Loc. 649 Annuity Tr. Fund v. Smith Barney Fund Mgmt. LLC*, 595 F.3d 86, 91 (2d Cir. 2010)); *Hamilton v. Westchester Cnty.*, 3 F.4th 86, 90–91 (2d Cir. 2021) (same).

[2] The Amended Complaint states that Plaintiff "has a[] full-scale IQ of 58[.]"  (Am. Compl. ¶ 2.)  A forensic psychological report of Plaintiff prepared by psychologist Cheryl Paradis is attached to the Amended Complaint as Exhibit D.  (*See* Cheryl Paradis Report, Ex. D to Am. Compl., Dkt. 32-5 ("Paradis Report")).   The report states that Plaintiff "has a significant neurocognitive disorder," "suffered a severe traumatic brain injury," has "extensive brain damage," and has impaired "attention and concentration skills and memory functions."  (*Id.* at 14.)  The report further notes that "[p]sychological testing indicates that [Plaintiff] . . . score[s] in the intellectually disabled range."  (*Id.*; *see also id.* at 15 (noting that Plaintiff "had clear signs of intellectual disability and/or a major neurocognitive disorder (i.e. dementia)").)  Based on this description and for ease of reference, the Court uses the term "intellectual disability" to refer to Plaintiff's condition, except when directly quoting other sources.

[3] Under N.Y. Penal Law § 130.30(2), "[a] person is guilty of rape in the second degree when . . . he or she engages in sexual intercourse with another person who is incapable of consent by reason of being mentally disabled or mentally incapacitated."  N.Y. Penal Law § 130.30(2).  As is relevant to this case, however, it is an affirmative defense that the defendant "did not know of the facts or conditions responsible for such incapacity to consent."  *Id.* § 130.10(1).

York Criminal Procedure Law § 440.10, which was joined by the Kings County District Attorney's Office ("KCDA") after a thorough investigation by its Conviction Review Unit ("CRU").  (Am. Compl. ¶ 3.)  The Amended Complaint asserts four causes of action arising out of Plaintiff's wrongful conviction, including a due process claim against Detective Paribello and three municipal liability claims against the City for the actions of the New York City Police Department ("NYPD"), KCDA, Bellevue Hospital, and the New York City Department of Corrections ("NYCDOC").

### A.      Plaintiff's Background

Plaintiff was born in Barbados in 1947.  (Am. Compl. ¶ 11.)  His parents were poor, and growing up, he received little education.  (*Id.*)  Plaintiff "had intellectual deficits as a child," which were exacerbated after Plaintiff was severely injured in a motorcycle accident.  (*Id.* ¶ 12.)  Plaintiff is illiterate, which he attributes to his lack of education, but "likely is also the result of [his] learning disability and the severe brain trauma he suffered in the aforementioned motorcycle accident." (*Id.* ¶ 16.)  As noted, Plaintiff has a full-scale IQ of 58.  (*Id.* ¶ 2.)

Plaintiff came to the United States in 1971 and became a lawful permanent resident in 1977.  (*Id.* ¶ 13.)  Also in 1977, Plaintiff married Ordeen Bishop Broomes ("Mrs. Broomes"), who is now deceased.  (*Id.* ¶ 14.)  Plaintiff and his wife resided in Brooklyn and raised four children together.  (*Id.*)  Plaintiff also has an older daughter from a previous relationship.  (*Id.*)  Plaintiff and Mrs. Broomes separated in 1992 but remained good friends until Mrs. Broomes passed away in 2022.  (*Id.* ¶ 15.)

### B.      The Investigation and Arrest

In 2006, Mrs. Broomes asked Plaintiff, who was retired and living alone, to move in with her mother, Mrs. Bishop, who was experiencing health difficulties.  (*Id.* ¶ 18.)  Plaintiff agreed, and moved in with Mrs. Bishop and "her intellectually disabled adult granddaughter, 'A.'"  (*Id.*)

3

In May 2011, "A. began to look a little heavier than usual." (*Id.* ¶ 21.)  Mrs. Broomes had A. take a home pregnancy test, which was positive.  (*Id.*)  A.'s pregnancy was confirmed at a hospital.  (*Id.*)  A. "steadfastly denied" having sex at all, but eventually named Plaintiff as her partner after the emergency room nurse pressured her and reassured A. that she would not get in trouble.[4]  (*Id.* ¶ 22.)  "From that point on, the matter was treated as a criminal investigation." (*Id.* ¶ 23.)  Mrs. Broomes and A. were placed in a room within the emergency room where they were questioned by police before being taken to the police station and separated.  (*Id.*)  A. "was roughly questioned" by Detective Paribello.  (*Id.*)  Mrs. Broomes, who was sitting outside the interview room, heard Detective Paribello "screaming" at A.  (*Id.*)

Although A. allegedly told the police and a KCDA prosecutor, Assistant District Attorney Lisa Nugent ("ADA Nugent"), that Plaintiff had forced her to have sex, she later informed the police (including Detective Paribello), prosecutors, and Mrs. Broomes that she only claimed to being forced to have sex out of fear.  (*Id.* ¶ 24.)  A. had been told that she was not supposed to have sex and was afraid that she would be beaten if she had told the truth.  (*Id.* ¶¶ 24, 28.)  Detective Paribello told Mrs. Broomes that A. had made the foregoing admission to him and had acknowledged having sex with Plaintiff on more than five occasions.  (*Id.* ¶ 25.)  Detective Paribello also told Mrs. Broomes that he did not believe that Plaintiff had raped A.  (*Id.*)  However, Detective Paribello did not tell the KCDA that A. had only claimed to being forced to have sex because she was afraid she might be beaten if she said otherwise, nor did Detective Paribello tell that KCDA that he himself did not believe A. had been raped.  (*Id.* ¶ 29.)  Plaintiff also alleges

---

[4] A. gave birth to a daughter, referred to here and in the Amended Complaint as "F." (Am. Compl. ¶ 38.)  A DNA test confirmed that Plaintiff is F.'s father.  (*Id.* ¶ 39.)

that Detective Paribello "unquestionably knew that [Plaintiff] suffered from an extreme mental disability," but did not inform the KCDA of such.  (*Id.*)

When Mrs. Broomes was interviewed by the KCDA, she was only asked if A. was disabled at birth.  (*Id.* ¶ 26.)  Mrs. Broomes responded that A. had attended and graduated from high school.  (*Id.*)  Later, when Mrs. Broomes was interviewed by the CRU, she stated that she also had informed the police and prosecution that A. and Plaintiff had had consensual sex; however, the CRU did not find notes of such statements in the police or prosecution case files.  (*Id.* ¶ 27; Public CRU Report,[5] Ex. A to Am. Compl., Dkt. 32-1 ("CRU Report"), at 95.)  According to the CRU's internal report, "the prosecution had no medical history for A., or any record of previous intellectual testing." (Internal CRU Report, Ex. A1 to Am. Compl., Dkt. 32-2 ("Internal CRU Report"), at 6.)  Rather, "[t]he only information the prosecutor seemed to have was based on brief interviews of A. and her aunt, and a short, unrecorded, and undocumented evaluation by an expert with a Master's Degree in Social Work, who opined that A. did not have the capacity to consent to sexual activity."  (*Id.*)

Plaintiff was arrested on May 3, 2011.  (Am. Compl. ¶ 29.)  When interviewed by Detective Paribello, Plaintiff denied raping A. and maintained that their relationship was consensual.  (*Id.*)

## C.    Grand Jury Proceedings

Plaintiff was indicted by a Kings County grand jury on two counts of Rape in the Second Degree, two counts of Sexual Misconduct, and Sexual Abuse in the Second Degree.  (*Id.* ¶ 31; *see also* Indictment No. 3711/2011, Ex. C to Am. Compl., Dkt. 32-4.)  When A. testified before the grand jury, "certain of her key testimony was related in language entirely inconsistent with her limited intelligence."  (Am. Compl. ¶ 32; *see also id.* ¶ 34 (noting that psychologist Cheryl Paradis

---

[5] The CRU Report refers to Plaintiff as "Charlie Bloom."  (Am. Compl. at 7 n.3.)

reviewed the transcript of A.'s grand jury testimony and noticed several anomalies that suggest that her testimony had been rehearsed).)  Additionally, at one point, A. indicated to the assistant district attorney ("ADA") presenting the case that she had something else to say, but then was removed from the grand jury room and not provided with an opportunity to add to her testimony when she returned.  (*Id.* ¶ 33.)

ADA Nugent told the grand jury that "[A.] is mentally disabled, has cerebral palsy and suffers from seizures which cause memory loss.  [A.] can recall one period of time in January where [Plaintiff] had sex with her." (*Id.* ¶ 35.)  A.'s inability to recall a sexual encounter with Plaintiff in September and October of 2010 was never disclosed to the defense, nor was the fact that A.'s condition caused memory loss.  (*Id.*)

The grand jury ultimately indicted Plaintiff for acts committed between September 1 and October 13, 2010, in addition to January 2011.  (*Id.*)

### D.      Plaintiff's Physical/Mental Evaluation

In May 2011, a few weeks after his arrest, Plaintiff was transferred from Rikers Island, where he was initially held, to Bellevue Hospital due to chest pains.  (*Id.* ¶ 40.)  The doctors and social worker who examined Plaintiff noted that he had "significant cognitive deficits" and assessed Plaintiff as suffering from dementia and/or Alzheimer's. (*Id.* ¶¶ 42–43.)  After a non-contrast CT scan of Plaintiff's head showed the presence of "extensive white matter disease," Plaintiff was started on medication to treat dementia and discharged with an order for outpatient neurology follow-up care.  (*Id.* ¶ 44.)  A forensic psychiatry expert later determined that Plaintiff had been suffering from dementia for several years.  (*Id.*)  Neither the hospital nor the NYCDOC alerted the KCDA, the defense, or the trial court of these observations and diagnoses.  (*Id.* ¶ 45.)

### E.      Guilty Plea and Sentencing

On March 15, 2012, Plaintiff, represented by Paul Liu ("Liu") from the Legal Aid Society, appeared in the Supreme Court of the State of New York, Kings County.  (*Id.* ¶¶ 48–49.)  ADA Allegra Santomauro informed the court "that the offer was second-degree rape and 'four years of jail.'"  (*Id.* ¶¶ 49–50.)  The court gave Plaintiff the option of pleading guilty to count one (an act occurring between September 1, 2010, and October 31, 2010) or count three (an act occurring between January 1, 2011, and January 31, 2011).  (*Id.* ¶ 51.)  Plaintiff chose to plead guilty to the first count.  (*Id.*)

In response to the court asking Plaintiff whether he wished to withdraw his plea of "not guilty" and enter a "guilty" plea, Plaintiff replied: "Well, I really didn't rape nobody.  Yes ma'am." (*Id.* ¶ 52.)  The court asked again: "Is that what you wish to do?  You wish to plead guilty?"  (*Id.*) Plaintiff said, "Yes."  (*Id.*)  Then the court asked Plaintiff whether anyone had "threatened or coerced" him to plead guilty.  (*Id.* ¶ 53.)  Plaintiff responded, "Well I don't know what to say." (*Id.*)  Again, the court asked Plaintiff whether he had been threatened or coerced, to which Plaintiff responded, "No." (*Id.*)  The court then asked Plaintiff if he had engaged in sexual intercourse with A.  (*Id.* ¶ 54.)  Plaintiff responded, "Yes."  (*Id.*)  Finally, the court asked Plaintiff whether A. "is incapable of consent by reason of mental disability or mental incapacity."  (*Id.*)  Plaintiff again responded, "Yes." (*Id.*)  The court and the ADA agreed to accept Plaintiff's guilty plea, and the matter was adjourned for sentencing.  (*Id.* ¶¶ 55, 57–58.)

Plaintiff appeared eleven days later, on March 26, 2012, for sentencing.  (*Id.* ¶ 59.)  At the sentencing, Plaintiff expressed confusion regarding the meaning of ten years post-release supervision.  (*Id.*)  Following an off-the-record conversation between Plaintiff and his defense counsel, defense counsel informed the court that Plaintiff had asked whether he could get a

sentence of three years.  (*Id.*)  The court responded: "No.  The promise is four plus ten?  Four years in jail plus ten years' parole supervision.  That is what I told you on the last date. . . . What changed?"  (*Id.*)  Plaintiff responded that he was "kind of surprised."  (*Id.*)  Nevertheless, the court imposed a sentence of four years plus ten years' post-release supervision.  (*Id.*)  The court also entered a final order of protection prohibiting any contact between Plaintiff and A. until 2034, which precluded Plaintiff from having any relationship with his daughter, F.  (*Id.*)

### F.    Post-Conviction Investigation and Exoneration

In July 2015, Plaintiff's newly assigned counsel[6] filed a motion to vacate and dismiss Plaintiff's conviction pursuant to N.Y. Crim. Proc. Law § 440.10(1)(h), arguing, that "[Plaintiff] was innocent of any criminal conduct because sex between two mentally disabled people is not, in and of itself, a crime, and that [Plaintiff's] guilty plea was unknowing, unintelligent, and involuntary."  (*Id.* ¶ 64.)  The KCDA did not respond to the motion; rather, "the CRU took the case under consideration, conducting an extensive investigation that included evaluations of Plaintiff and [] A., interviews with Mrs. Broomes and [Plaintiff's] former defense attorney . . . , and a reexamination of the relevant files and records in the case."  (*Id.* ¶ 65.)

On May 23, 2019, before the Honorable Matthew D'Emic, Plaintiff's counsel renewed the motion to vacate, arguing that Plaintiff's plea was unknowing, unintelligent, and involuntary, and that Plaintiff was deprived of effective assistance of counsel.  (*Id.* ¶ 66.)  The CRU also recommended that Plaintiff's "conviction be vacated based on its conclusion that [Plaintiff] was likely mentally disabled at the time of the alleged offense."  (CRU Report at 9, 95.)  Justice D'Emic

---

[6] Counsel was initially appointed to represent Plaintiff on his direct appeal; however, she realized that Plaintiff's "cognitive defects were so obvious" that she instead filed a § 440.10 motion.  (Am. Compl. ¶ 64 n.10; *see also id.* ¶ 60 (explaining that plaintiff "initially appealed his conviction to the Appellate Division, Second Department, but thereafter moved the [c]ourt . . . for an order deeming his appeal dismissed following vacatur of the conviction").)

granted Plaintiff's motion.  (Am. Compl. ¶ 66.)  The KCDA then moved to dismiss the indictment, arguing that Plaintiff was "likely intellectually disabled at the time of the offense and thus unable to determine A.'s ability to consent to sexual intercourse, and that [Plaintiff] was deprived of the effective assistance of counsel."  (*Id.*)  Justice D'Emic granted the motion to dismiss.  (*Id.* ¶ 67.)

### G.  The CRU Report

On July 9, 2020, the KCDA released a public report titled *426 Years: An Examination of Wrongful Convictions In Brooklyn, New York* (the "CRU Report"), which included analysis of Plaintiff's case.  (*Id.* ¶ 70; *see* CRU Report.)  The CRU explained that "[Plaintiff] was himself likely mentally disabled at the time of the offense, and thus was unable to perceive that the victim was incapable of consent."  (CRU Report at 30.)  Because Plaintiff "likely did not understand the legal consequences of his actions . . . [he] did not possess the mental state necessary to be guilty of the crime."  (*Id.*)  While "[Plaintiff's] defense counsel failed to develop and then make any argument along these lines," the CRU also "determined that law enforcement and the court also shared some blame."  (*Id.*; *see also id.* at 69 (discussing defense counsel's failure to investigate).)  The CRU further found that Plaintiff's guilty plea "was probably unknowing and, consequently, involuntary."  (*Id.* at 77.)

* * *

In total, Plaintiff served close to 3.5 years in prison and several more years of post-release supervision.  (Internal CRU Report at 2; CRU Report at 95.)  Plaintiff was also required to register under the New York State Sex Offender Registry Act and was exposed to the threat of deportation.  (Internal CRU Report at 2.)  As noted, the trial court also entered a final order of protection prohibiting any contact between Plaintiff and A. until 2034, which precluded Plaintiff from having any relationship with his daughter, F.  (Am. Compl. ¶ 59.)

9

## II.     Procedural History

Plaintiff commenced the present action on May 13, 2022.  (*See* Compl., Dkt. 1.)  On August 5, 2022, Defendants answered Plaintiff's initial complaint, (Answer, Dkt. 13), and the case proceeded to discovery, (*see* Proposed Scheduling Order, Dkt. 17; 10/11/2022 Min. Entry & Order; 1/18/2023 Discovery Order).

Subsequently, on February 28, 2023, Defendants requested a pre-motion conference ("PMC") for an anticipated partial motion for judgment on the pleadings.  (Defs.' PMC Ltr., Dkt. 27.)  The Court granted Defendants' request, which was unopposed, and scheduled a PMC for May 1, 2023.  (4/6/2023 Docket Order.)  Then, on April 10, 2023, Plaintiff, on consent filed the operative Amended Complaint, (Am. Compl.), thereby rendering Defendants' previous PMC request moot, (4/24/2024 Docket Order).  Defendants filed a second PMC request, this time in anticipation for a partial motion to dismiss the Amended Complaint.  (Defs.' 2d PMC Ltr., Dkt. 34.)  The Court granted Defendants' second request, (4/24/2023 Docket Order), and held a PMC with the parties on May 1, 2023, (5/1/2023 Min. Entry).  The Court granted Defendants leave to file their anticipated motion and set a briefing schedule.  (5/1/2023 Min. Entry.)  The motion was fully briefed as of July 31, 2023.  (*See* Dkts. 40–43.)[7]

---

[7] The Court notes the excessive length of Plaintiff's 35-page opposition brief.  (*See* Pl.'s Mem. Opp'n Mot. to Dismiss, Dkt. 43 ("Pl.'s Opp'n").)  The Court's Individual Rules impose a 25-page limit on opposition briefs, and Plaintiff did not seek permission to file excess pages. *See* Judge Pamela K. Chen Individual Practices and Rules 3.B. ("Unless prior permission has been granted, memoranda of law in support of and in opposition to motions are limited to 25 pages, not including exhibits, appendices or attachments.").  The Court further notes that Plaintiff's counsel did not use the allotted space well, as illustrated by the excessive use of block quotes throughout. (*See, e.g.*, Pl.'s Opp'n, at 5, 7, 10, 13–14, 16, 18–19, 21–23, 28, 30).  Most egregiously, Plaintiff's counsel wastes nearly two full pages excerpting the standard of review for a motion to dismiss from a Second Circuit decision, (*see id.* at 1–3 (quoting *Lynch v. City of New York*, 952 F.3d 67, 74–76 (2d Cir. 2020)), and several more pages copying and pasting excerpts of the Amended Complaint, (*see id.* at 13–14, 21–23, 29–30).  While the Court would be within its discretion to

## LEGAL STANDARD

To survive a motion to dismiss pursuant to Rule 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (citing *Twombly*, 550 U.S. at 556). "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.* (quoting *Twombly*, 550 U.S. at 556). Determining whether a complaint states a plausible claim for relief is "a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Id.* at 679 (citation omitted). "In addressing the sufficiency of a complaint[, the court] accept[s] as true all factual allegations and draw[s] from them all reasonable inferences; but [the court is] not required to credit conclusory allegations or legal conclusions couched as factual allegations." *Rothstein v. UBS AG*, 708 F.3d 82, 94 (2d Cir. 2013). "Dismissal is inappropriate unless it appears beyond doubt that the plaintiff can prove no set of facts which would entitle him or her to relief." *Sweet v. Sheahan*, 235 F.3d 80, 83 (2d Cir. 2000).

"The question on a motion to dismiss 'is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims.'" *LM Ins. Corp. v. James*

---

disregard the last ten pages of Plaintiff's brief, it does not do so here in part because Defendants did not object to the excess pages. *See Nat'l Grid Corp. Servs., LLC v. Brand Energy Servs., LLC*, No. 13-CV-1275 (DRH) (ARL), 2017 WL 1194499, at *10 (E.D.N.Y. Mar. 30, 2017) ("[A]s a court has inherent discretion to strike excessive pages, it must also have reciprocal discretion to waive page limits."). Nevertheless, Plaintiff's counsel is warned to review the Court's Individual Rules and ensure compliance going forward.

*River Ins. Co.*, No. 22-CV-7472 (ER), 2023 WL 5509264, at *3 (S.D.N.Y. Aug. 25, 2023) (quoting *Sikhs for Just. v. Nath*, 893 F. Supp. 2d 598, 615 (S.D.N.Y. 2012)).   When considering a Rule 12(b)(6) motion, the court must "test, in a streamlined fashion, the formal sufficiency of the plaintiff's statement of a claim for relief *without* resolving a contest regarding its substantive merits." *Glob. Network Commc'ns, Inc. v. City of New York.*, 458 F.3d 150, 155 (2d Cir. 2006). As such, courts typically "do not consider matters outside the pleadings in deciding a motion to dismiss for failure to state a claim." *Nakahata v. New York-Presbyterian Healthcare Sys., Inc.*, 723 F.3d 192, 202 (2d Cir. 2013); *see also Goel*, 820 F.3d at 559 ("Because a Rule 12(b)(6) motion challenges the complaint as presented by the plaintiff, taking no account of its basis in evidence, a court adjudicating such a motion may review only a narrow universe of materials.").   However, in addition to the facts alleged in the complaint, the court may also consider documents that are appended to the complaint, incorporated in the complaint by reference, or integral to the complaint, as well as matters of which judicial notice may be taken.   *Goel*, 820 F.3d at 559.   If the court considers any extrinsic material beyond the aforementioned exceptions, "the motion shall be treated as one for summary judgment and disposed of as provided in [Federal Rule of Civil Procedure] 56, and all parties shall be given a reasonable opportunity to present all material made pertinent to such a motion . . . ." *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 152 (2d Cir. 2002) (alteration in original) (quoting Fed. R. Civ. P. 12(b)); *see also Nakahata*, 723 F.3d at 202–03 ("As indicated by the word 'shall,' the conversion of a Rule 12(b)(6) motion into one for summary judgment under Rule 56 when the court considers matters outside the pleadings is strictly enforce[d] and mandatory." (alteration in original) (quoting *Glob. Network Commc'ns, Inc.*, 458 F.3d at 155)).

## DISCUSSION

### I.    Plaintiff's Due Process Claim Against Detective Paribello

The Amended Complaint alleges that Detective Paribello violated Plaintiff's due process rights as guaranteed by the Fourteenth Amendment by failing to disclose to the KCDA that: (1) "Plaintiff was cognitively impaired;" (2) A. had admitted that she claimed Plaintiff had raped her because she was afraid to acknowledge their relationship was consensual; and (3) "A. was unable to recall when she had [had] sex with [Plaintiff] or that the only encounter with [Plaintiff] she recalled was in January 2011," and not between September 1, 2010, and October 31, 2010.   (Am. Compl. ¶¶ 107–11.)   Defendants move to dismiss the due process claim as to Detective Paribello's failure to disclose Plaintiff's intellectual disability.   (Defs.' Mem. of Law in Supp. of Mot. to Dismiss, Dkt. 41 ("Defs.' Mem."), at 7.)   Defendants argue that this ground for Plaintiff's due process claim fails because Detective Paribello did not have an affirmative duty to detect and report Plaintiff's intellectual disability and because Detective Paribello is entitled to qualified immunity. (*Id.* at 7–14.)   The Court disagrees.

Under the Due Process Clause of the Fourteenth Amendment, no State shall "deprive any person of life, liberty, or property, without due process of law."   U.S. Const. amend. XIV, § 1; *see also Ying Li v. City of New York*, 246 F. Supp. 3d 578, 625 (E.D.N.Y. 2017) ("The Due Process Clause was 'intended to secure the individual from the arbitrary exercise of the powers of government.'" (quoting *Daniels v. Williams*, 474 U.S. 327, 331 (1986))).   Pursuant to *Brady v. Maryland*, a prosecutor violates a criminal defendant's right to due process by failing to disclose material evidence that is favorable to the accused.   373 U.S. 83, 87 (1963); *accord United States v. Coppa*, 267 F.3d 132, 139 (2d Cir. 2001) ("The basic rule of *Brady* is that the Government has a constitutional duty to disclose favorable evidence to the accused where such evidence is 'material'

either to guilt or to punishment." (citing *Brady*, 373 U.S. at 87)).  Police officers also "can be held liable for *Brady* due process violations under § 1983 if they withhold exculpatory evidence from prosecutors."  *Bermudez v. City of New York*, 790 F.3d 368, 376 n.4 (2d Cir. 2015); *see also Bellamy v. City of New York*, 914 F.3d 727, 751 (2d Cir. 2019) ("When police officers withhold exculpatory or impeaching evidence from prosecutors, they may be held liable under § 1983 for violating the disclosure requirements of *Brady v. Maryland*."); *Fappiano v. City of New York*, 640 F. App'x 115, 118 (2d Cir. 2016) (summary order) ("A fair trial claim may also arise where the police or prosecutors withhold material exculpatory or impeaching evidence from a defendant. The latter theory of liability is essentially a civil claim seeking damages for a *Brady* violation.").

A *Brady* violation contains three elements: "(1) the Government, either willfully or inadvertently, suppressed evidence; (2) the evidence at issue is favorable to the defendant; and (3) the failure to disclose this evidence resulted in prejudice."  *Coppa*, 267 F.3d at 140.  "To establish prejudice, a plaintiff must show the evidence was material; i.e., whether the 'evidentiary suppression undermines confidence in the outcome of the trial.'"  *Fappiano*, 640 F. App'x at 118 (quoting *Leka v. Portuondo*, 257 F.3d 89, 104 (2d Cir. 2001)).

Here, Plaintiff states a plausible *Brady* violation due process claim against Detective Paribello.  Plaintiff alleges that Detective Paribello "denied [Plaintiff] due process . . . by failing to bring to the attention of the [KCDA], as had to have been obvious from his interviews with [Plaintiff] and others, that [Plaintiff] was cognitively impaired and, for this reason among others, [might] not be guilty of rape."  (Am. Compl. ¶ 107.)  Plaintiff also alleges that Detective Paribello "unquestionably knew that Plaintiff suffered from an extreme mental disability," but "did not inform the [KCDA] of such."  (*Id.* ¶ 29; *see also* Internal CRU Report at 15 & n.25 (explaining that "[t]he detective who interviewed [Plaintiff] either did not detect any signs of possible mental

disability . . . or did [] but failed to relate this information to the KCDA").)  As Plaintiff argues in his brief, such information was favorable to Plaintiff and material in that its disclosure "would 'probably' have altered the outcome [of Plaintiff's criminal case]."  (Pl.'s Opp'n at 4.)  Indeed, this is the rare case in which we *know* that disclosure of the allegedly suppressed information would have led to a different result: when information concerning Plaintiff's intellectual disability came to light, the KCDA agreed that Plaintiff's conviction should be vacated because he likely was not guilty of the crime for which he was sentenced.  (*See* Am. Compl. ¶ 66; *see also* Pl.'s Opp'n at 4; CRU Report at 9, 30, 77; Internal CRU Report at 2 ("Had [Plaintiff's] likely intellectual disability been recognized during the prosecution of this case, it would have or should have obviated the prosecution or at least given rise to a viable legal defense to the rape charge."); *id.* at 14–15.)  These allegations are sufficient to survive Defendants' motion to dismiss.

Defendants' arguments to the contrary are not persuasive.  First, Defendants argue that the duty to detect and evaluate a criminal defendant's competence lies with the trial court and defense counsel, as opposed to the prosecution and police.  (Defs.' Mem. at 9–11.)  Second, Defendants argue that information related to Plaintiff's intellectual disability cannot be considered *Brady* material because Plaintiff knew or should have known of it himself.  (*Id.* at 10–11 (citing *United States v. Avenatti*, No. 19-CR-374 (JMF), 2022 WL 457315, at *12 (S.D.N.Y. Feb. 15, 2022) ("*Brady* does not require the Government to 'acquire' evidence or information from others (let alone evidence or information that is already in the defendant's possession")).)  But the Court will not adopt bright-line rules that ignore the individual facts and circumstances of a case to absolve the prosecution (and, by extension, the police) from *any* responsibility for disclosing evidence related to a criminal defendant's mental capacity or intellectual disability, particularly where, as here, such evidence is readily apparent and negates an essential element of the charged offense.

*See* N.Y. Penal Law § 130.10(1) ("In any prosecution under this article in which the victim's lack of consent is based solely upon his or her incapacity to consent because he or she was mentally disabled, mentally incapacitated or physically helpless, it is an affirmative defense that the defendant, at the time he or she engaged in the conduct constituting the offense, did not know of the facts or conditions responsible for such incapacity to consent."); (*see also* CRU Report at 30 (explaining that Plaintiff likely "did not possess the mental state necessary to be guilty of the crime")). Moreover, as Defendants acknowledge, "the criminal trial of an incompetent defendant violates due process," as does "the failure to observe procedures adequate to protect a defendant's right not to be tried or convicted while incompetent to stand trial." (Defs.' Mem. at 8–9 (first quoting *Cooper v. Oklahoma*, 517 U.S. 348, 354 (1996), then quoting *Drope v. Missouri*, 420 U.S. 162, 172 (1975)).) While the trial court and defense counsel certainly play an important role in upholding these constitutional requirements, so too do the prosecution and police, as recognized by the *Brady* doctrine. And while the *Brady* doctrine might not be triggered where a defendant already possesses the exculpatory information, the Court finds that here the fact that defense counsel (though not Plaintiff himself) might or should have known of Plaintiff's intellectual disability did not automatically relieve Detective Paribello of his obligation to disclose what allegedly was patently critical exculpatory information to the prosecutors. Indeed, this conclusion is especially appropriate where it is the investigator, as opposed to the prosecutor, who fails to disclose *Brady* information, since the defense attorney presumably has not even come into the picture because the defendant has not yet been charged (and perhaps would not have been charged had the investigator disclosed the *Brady* information to the prosecutor in the first place).

Nor is the Court persuaded that defense counsel's failure to raise the issue of Plaintiff's cognitive impairment (or, for that matter, the trial court's failure to hold a competency hearing)

"cut off the chain of proximate causation between Detective Paribello's omission and [P]laintiff's conviction." (Defs.' Mem. at 12.) "A proximate cause determination does not require a jury to identify the liable party as the sole cause of harm; it only asks that the identified cause be a substantial factor in bringing about the injury." *Hydro Invs., Inc. v. Trafalgar Power Inc.*, 227 F.3d 8, 15 (2d Cir. 2000). In the context of a fair trial claim, "an intervening decision-maker will not absolve a defendant of liability if the defendant 'misled or coerced the intervening decision-maker such that the decision-maker's conduct was tainted,' or if the intervening decision-maker 'was simply not informed of the alleged problems with the evidence.'" *Hamilton v. City of New York*, No. 15-CV-4574 (CBA) (SJB), 2019 WL 1452013, at *17 (E.D.N.Y. Mar. 19, 2019) (quoting *Bermudez*, 790 F.3d at 374). "The Second Circuit has also suggested that '[e]ven if the intervening decision-maker (such as a prosecutor, grand jury, or judge) is not misled or coerced, it is not readily apparent why the chain of causation should be considered broken where the initial wrongdoer can reasonably foresee that his misconduct will contribute to an "independent" decision that results in a deprivation of liberty.'" *Id.* (alteration in original) (quoting *Higazy v. Templeton*, 505 F.3d 161, 177 (2d Cir. 2007)); *see also Hydro Invs., Inc.*, 227 F.3d at 15. Ultimately, however, "foreseeability and causation . . . are issues generally and more suitably entrusted to fact finder adjudication," and thus, the Court declines to dismiss Plaintiff's claim on this basis. *See Higazy*, 505 F.3d at 175 (quoting *Lombard v. Booz–Allen & Hamilton, Inc.*, 280 F.3d 209, 216 (2d Cir. 2002)).

Defendants also argue that "Detective Paribello had no affirmative duty to ascertain [P]laintiff's cognitive impairment," but that even if such an affirmative duty existed, Detective Paribello would be entitled to qualified immunity "because such a duty is not clearly established." (Defs.' Mem at 12–13; *see also* Defs.' Reply in Supp. of Mot. to Dismiss, Dkt. 42 ("Defs.' Reply"),

at 2.)[8]  This argument misses the point.  Detective Paribello *did* have a duty to disclose exculpatory evidence to prosecutors, and Plaintiff alleges Detective Paribello violated that duty by withholding exculpatory evidence pertaining to Plaintiff's capacity to commit the crime charged.  *See, e.g.*, *Bermudez*, 790 F.3d at 376 n.4; *Bellamy*, 914 F.3d at 751; *Fappiano*, 640 F. App'x at 118. Moreover, Detective Paribello's duty under *Brady* was clearly established at the time of Plaintiff's arrest in 2011 and subsequent plea in 2012.  *See Walker v. City of New York*, 974 F.2d 293, 299 (2d Cir. 1992) ("[P]olice satisfy their obligations under *Brady* when they turn exculpatory evidence over to the prosecutors."); *Horn v. Stephenson*, 11 F.4th 163, 171 (2d Cir. 2021) ("*Walker* clearly established the duty of police to share with the prosecutor any *Brady* evidence that is favorable to the accused.").  For this reason, Detective Paribello is not entitled to qualified immunity on Plaintiff's due process claim.  *See, e.g.*, *Horn*, 11 F.4th at 170–71 (concluding that police forensic examiner was not entitled to qualified immunity on *Brady* due process claim because "the duty of police to share with the prosecutor any *Brady* evidence that is favorable to the accused" was clearly established as early as 1992 in *Walker*); *see also Levantino v. Skala*, 56 F. Supp. 3d 191, 202 (E.D.N.Y. 2014*)* ("A defendant asserting a qualified immunity defense on a motion to dismiss 'faces a formidable hurdle . . . and is usually not successful.'" (quoting *Field Day, LLC v. Cnty. of Suffolk*, 463 F.3d 167, 191–92 (2d Cir. 2006))).

---

[8] Defendants also dispute whether Detective Paribello did in fact know about Plaintiff's intellectual disability.  (*See, e.g.*, Defs.' Reply at 2.)  However, on a motion to dismiss pursuant to Rule 12(b)(6), the Court must "accept[] all well-pleaded allegations in the complaint as true, drawing all reasonable inferences in [Plaintiff's] favor." *Int'l Code Council, Inc.*, 43 F.4th at 53 (alteration in original) (quotation omitted).  Whether or not Detective Paribello knew about Plaintiff's intellectual disability is a factual dispute that the Court cannot resolve at this stage.  *See Bernstein v. Seeman*, 601 F. Supp. 2d 555, 556 (S.D.N.Y. 2009) ("[A] motion to dismiss is not the proper stage at which to resolve factual disputes.").  Similarly, whether Detective Paribello should have perceived Plaintiff's intellectual disability is a factual question that cannot be resolved on a motion to dismiss.

II.     **Plaintiff's Municipal Liability Claims Against the City**

Plaintiff asserts municipal liability (or *Monell*) claims against the City in connection with alleged due process violations caused by the actions of the NYPD, the KCDA, Bellevue Hospital, and the NYCDOC.  (*See generally* Am. Compl. ¶¶ 112–42.)  For the reasons that follow, the Court finds that Plaintiff plausibly states a *Monell* claim against the City in connection with the actions of the KCDA, but not as to the other entities, as to which Plaintiff's municipal liability claims are dismissed.[9]

A.     **Claim Against the City for the Actions of the NYPD**

A municipality, like the City, may be liable under Section 1983 if a municipal "policy or custom" caused a deprivation of constitutional rights.  *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 690–91, 694 (1978); *Jones v. Town of East Haven*, 691 F.3d 72, 80 (2d Cir. 2012) ("[A] municipality can be held liable under Section 1983 if the deprivation of the plaintiff's rights under federal law is caused by a governmental custom, policy, or usage of the municipality.").  "A policy or custom may be established by any of the following: (1) a formal policy officially endorsed by the municipality; (2) actions or decisions made by municipal officials with decision-making authority; (3) a practice so persistent and widespread that it constitutes a custom through which constructive notice is imposed upon policymakers; or (4) a failure by policymakers to properly train or supervise their subordinates, such that the policymakers exercised 'deliberate indifference' to the rights of the plaintiff."  *Moran v. Cnty. of Suffolk*, No. 11-CV-3704 (PKC) (GRB), 2015

---

[9] The Court does not consider the extrinsic materials that Plaintiff cites to in his brief that are not attached to, or otherwise incorporated into, the Amended Complaint.  *Friedl v. City of New York*, 210 F.3d 79, 83–84 (2d Cir. 2000) ("[A] district court errs when it considers affidavits and exhibits submitted[,] . . . or relies on factual allegations contained in legal briefs or memoranda in ruling on a 12(b)(6) motion to dismiss." (cleaned up)).

WL 1321685 (E.D.N.Y. Mar. 24, 2015); *see also Fleurimond v. Holder*, 403 F. Supp. 3d 95, 114 (E.D.N.Y. 2019) ("To demonstrate an official policy or custom, a plaintiff must show 'the existence of a formal policy which is officially endorsed by the municipality,' or a practice that is 'so persistent and widespread that it constitutes a custom or usage of which supervisory authorities must have been aware, or that a municipal custom, policy, or usage can be inferred from the evidence of deliberate indifference of supervisory officials as to such abuses.'" (quoting *Iacovangelo v. Corr. Med. Care, Inc.*, 624 F. App'x 10, 13 (2d Cir. 2015) (summary order))). "In order to establish *Monell* liability based upon a 'persistent and widespread' practice by a subordinate municipal employee (or employees) other than a policymaker, the employee's unconstitutional conduct must be 'so manifest as to imply the constructive acquiescence of senior policy-making officials.'" *Lucente v. Cnty. of Suffolk*, 980 F.3d 284, 297–98 (2d Cir. 2020). For a *Monell* claim to survive a motion to dismiss, a plaintiff must allege "sufficient factual detail[]" and not mere "boilerplate allegations" that the violation of the plaintiff's constitutional rights resulted from the municipality's custom or official policy. *Plair v. City of New York*, 789 F. Supp. 2d 459, 469 (S.D.N.Y. 2011) (collecting cases).

Plaintiff's Second Cause of Action is a municipal liability claim against the City premised on the conduct of the NYPD. Specifically, Plaintiff alleges that the City and NYPD policymakers acted "with deliberate indifference" by failing to provide adequate training to NYPD officers concerning the detection and reporting of "apparent mental impairment of suspects and arrestees that may impact their guilt, . . . even though they knew to a moral certainty that constitutional rights were imperiled having been presented reports detailing said risks, and having entered into settlements recognizing these risks, and having been subject to both City and State laws reflecting the need to avoid such risks." (Am. Compl. ¶ 113.) Plaintiff further alleges that "NYPD

policymaking officials instituted and implemented plainly inadequate policies, procedures, regulations, practices, customs, training, supervision, and discipline concerning the continuing duty of police investigators to preserve and to make timely disclosure to the District Attorney, during criminal investigations and prosecutions, of all material evidence or information ('*Brady* material') favorable to a person suspected, accused or convicted of criminal conduct." (*Id*. ¶ 114.) Accordingly, the Court interprets the Amended Complaint as alleging municipal liability based on both a "deliberate indifference" theory and a "constructive acquiescence" theory. (*See also* Pl.'s Opp'n at 13 ("Plaintiff's Second Cause of Action alleges the Defendant City of New York is liable under *Monell*, principally under two related theories: *first*, the NYPD's – and consequently the City's – deliberate indifference in failing to train police officers to detect and disclose evidence of cognitive impairment of arrestees bearing on guilt or innocence; and *second*, its deliberate indifference in failing to institute appropriate procedures to assure police detect and disclose *Brady* material relating to matters such as an arrestee's cognitive impairment and a witness's credibility.").) Under either theory, Plaintiff's claim fails.

Deliberate indifference "is a stringent standard of fault, requiring proof that a municipal actor disregarded a known or obvious consequence of [their] action." *Connick v. Thompson*, 563 U.S. 51, 61 (2011) (quoting *Bd. of Cnty. Comm'rs of Bryan Cnty. v. Brown*, 520 U.S. 397, 410 (1997); *see also Newkirk v. Cnty. of Suffolk*, No. 17-CV-2960 (MKB), 2022 WL 824137, at *8 (E.D.N.Y. Mar. 18, 2022) (explaining that the plaintiff must show "that 'the need for more or better supervision to protect against constitutional violations was obvious'" (quoting *Outlaw v. City of Hartford*, 884 F.3d 351, 373 (2d Cir. 2018))); *Fleurimond*, 403 F. Supp. 3d at 115 ("[A] policymaker does not exhibit deliberate indifference by failing to train employees for rare or unforeseen events." (quoting *Walker v. City of New York*, 974

21

F.2d 293, 297–98 (2d Cir. 1992))); *see also Fowler v. City of New York*, No. 13-CV-2372 (KAM) (ST), 2019 WL 1368994, at *12 (E.D.N.Y. Mar. 26, 2019) (noting that "[t]he Supreme Court has cautioned that municipal liability under *Monell* is 'at its most tenuous' under a failure to train theory" (quoting *Connick*, 563 U.S. at 61)), *aff'd*, 807 F. App'x 137 (2d Cir. 2020) (summary order). "The operative inquiry is whether the facts suggest that the policymaker's inaction was the result of a 'conscious choice' rather than mere negligence." *Newkirk*, 2022 WL 824137, at *8 (quoting *Amnesty Am. v. Town of West Hartford*, 361 F.3d 113, 128 (2d Cir. 2004)). Likewise, for a constructive acquiescence claim, "there must be 'sufficient instances of tolerant awareness by supervisors of abusive conduct to support an inference that they had a policy, custom or usage of acquiescence in such abuse.'" *Lucente*, 980 F.3d at 297–98 (quoting *Jones*, 691 F.3d at 82). As the Second Circuit has explained, "[i]t is only at that point that, although not expressly authorized, the unconstitutional conduct is so persistent and widespread that it can constitute a custom or usage of which a supervising policymaker must have been aware." *Id.*

In addition to the alleged constitutional violations that Plaintiff himself experienced, the Amended Complaint references numerous other criminal and civil cases that purportedly support Plaintiff's *Monell* claim. (*See* List of Criminal Cases, Ex. L to Am. Compl., Dkt. 32-13 ("List of Criminal Cases"); List of Civil Cases, Ex. M to Am. Compl., Dkt. 32-14 ("List of Civil Cases").) Exhibit L to the Amended Complaint lists fifteen criminal cases from between 1990 and 2002 that ostensibly involved *Brady* violations committed by the NYPD, (List of Criminal Cases at 1–2), while Exhibit M to the Amended Complaint lists twenty-five civil cases and settlements from between 1992 and 2006, (List of Civil Cases).

A plaintiff may allege a policy or custom by "citing to complaints in other cases that contain similar allegations, provided those complaints involve factually similar misconduct, are

contemporaneous to the misconduct at issue in the plaintiff's case, and result in an adjudication of liability." *Jackson v. Nassau Cnty.*, 552 F. Supp. 3d 350, 378 (E.D.N.Y. 2021) (cleaned up).  Here, however, the cases that Plaintiff references provide little support for his claim.  Most of the civil cases do not concern *Brady* violations at all.  (*See generally* List of Civil Cases (citing three cases involving false testimony or statements of police officers and 18 cases involving arrests without probable cause).)  These cases therefore do not support a *Monell* claim based on the failure to train police officers in detecting suspects' or arrestees' intellectual disabilities or with regards to their *Brady* obligations.  *See Jackson*, 552 F. Supp. 3d at 379–80 (finding allegations insufficient to plead *Monell* claim where complaint cited to lawsuits that "d[id] not involve factually similar misconduct" to the misconduct underlying the alleged constitutional violation); *Collins v. City of New York*, 923 F. Supp. 2d 462, 479 (E.D.N.Y. 2013) (finding complaint's reference to a "litany of other police-misconduct cases" failed to support *Monell* claim because they involved different issues "or something less (settlements without admissions of liability and unproven allegations) than evidence of misconduct"); *Pluma v. City of New York*, No. 13-CV-2017 (LAP), 2015 WL 1623828, at *12 (S.D.N.Y. Mar. 31, 2015) (finding complaint that referenced "[a] handful of dissimilar incidents occurring over the course of more than a decade" failed to plausibly allege *Monell* claim).  Moreover, all but one of the civil cases resulted in settlements, as opposed to adjudications of liability.  *See Swanson v. City of New York*, No. 16-CV-3231 (MKB), 2017 WL 3130322, at *13 (E.D.N.Y. July 21, 2017) ("Allegations from other complaints, as opposed to adjudications by courts, do not offer strong support for a municipal liability claim."); *Cruz v. City of New York*, No. 15-CV-2265 (PAE), 2016 WL 234853, at *5 (S.D.N.Y. Jan. 19, 2016) (finding plaintiff failed to plausibly allege a policy or practice where "[a]ll of the cases cited settled short of adjudication on the merits").  And the most recent criminal case that Plaintiff cites is from nearly

a decade before Plaintiff's arrest and guilty plea.  (*See* List of Criminal Cases at 2 (citing *People v. Cannon*, 743 N.Y.S.2d 136 (N.Y. Sup. Ct. 2002)).)  Thus, the referenced criminal cases also fail to support Plaintiff's *Monell* claim against the City based on the NYPD's conduct.  *See, e.g.*, *Lopez v. City of New York*, No. 20-CV-2502 (LJL), 2022 WL 2078194, at *6–7 (S.D.N.Y. June 9, 2022) (explaining that courts may consider the time span of the actions alleged when evaluating a *Monell* claim and dismissing *Monell* claim where, *inter alia*, most of the specific allegations set forth in the complaint "concern[ed] statements or events that occurred more than (or close to) a decade prior to the events at issue in [the plaintiff's] case").

Plaintiff's conclusory reference to the 1994 Mollen Commission report on "police misconduct" fares no better.  (*See* Am. Compl. ¶ 83.)  Even if Plaintiff had connected the misconduct discussed in the Mollen Commission report to the misconduct alleged in the Amended Complaint, Plaintiff has not alleged facts that give rise to a plausible inference that such "widespread [misconduct] continued to the relevant time period for this case."  *See Lopez*, 2022 WL 2078194, at *8; *see also Greene v. City of New York*, No. 21-CV-05762 (PAC), 2024 WL 1308434, at *19 (S.D.N.Y. Mar. 26, 2024) ("As the allegations in the [complaint] occurred some twenty years after the issuance of the report, the [c]ourt cannot consider it as evidence of a widespread practice."); *cf. Johnson v. City of New York*, No. 22-CV-3320 (DG) (PK), 2023 WL 11868258, at *19 (E.D.N.Y. Sept. 15, 2023) ("Plaintiff has plausibly alleged a connection to the Mollen Report, as he alleges that the Individual Defendants coerced confessions and fabricated police reports in 1996, shortly after the Mollen Report was issued.").

Finally, Plaintiff cites to numerous news articles, reports, and studies on the prevalence of mental illness and cognitive disability among pre-trial arrestees.  (*See* Am. Compl. at 19–21.)  "'Research reports may be used to bolster *Monell* claims, but only if those reports are sufficiently

connected to the specific facts of the case' and are of relatively recent vintage."  *Isaac v. City of New York*, No. 16-CV-4729 (KAM), 2018 WL 5020173, at *17 (E.D.N.Y. Aug. 6, 2018) (quoting *Gomez v. City of New York*, No. 16-CV-1274 (NGG) (LB), 2017 WL 1034690, at *11 (E.D.N.Y. Mar. 16, 2017)), *R. & R. adopted*, 2018 WL 4583481 (E.D.N.Y. Sept. 24, 2018).  Here, the Court agrees with Defendants that studies showing the prevalence of *mental illness* among pre-trial detainees have little bearing on the likelihood of *intellectual disability* among that population.  (Defs.' Mem. at 18–20.)  The only data that Plaintiff references that clearly relates to his *Monell* claim is a 2012 Urban Institute study that revealed that 6.5% of Brooklyn Mental Health Court participants from 2002 to 2006 suffered from "Brain impairment," 2.4% suffered from a developmental disorder, and 0.7% suffered from either "Delirium, dementia, amnesic, and other cognitive disorders."  (Am. Compl. ¶ 76 & n.13.)  Without more, however, this data does not allow the Court to infer that there was an "obvious" need for more or better supervision or training of NYPD officers to protect against constitutional violations like those alleged by Plaintiff.

Accordingly, Plaintiff's *Monell* claim based on the actions of the NYPD is dismissed.

## B.   Claim Against the City for the Actions of the KCDA

Plaintiff's Third Cause of Action is a municipal liability claim against the City based on the conduct of the KCDA.  (*See id.* ¶¶ 122–131.)  Plaintiff alleges that the City and the KCDA: (1) acted "with deliberate indifference" by failing to provide adequate training concerning the detection and reporting of "apparent mental impairment of suspects and arrestees that may impact their guilt," (*id.* ¶ 123); (2) "instituted and implemented plainly inadequate policies, procedures, regulations, practices, customs, training, supervision, and discipline concerning the continuing duty of personnel within the KCDA[] to preserve and to make timely disclosure during criminal investigations and prosecutions, of all material evidence or information ('*Brady* material')

favorable to a person suspected, accused or convicted of criminal conduct," (*id.* ¶ 125); and (3) acted "with deliberate indifference to the constitutional rights of individuals suspected of criminal activity" by "elect[ing] not to provide members of the KCDA[] with minimally adequate training (if any training at all) to detect and report apparent mental impairment of victims alleged to be incapable of consent," (*id.* ¶ 124).  Plaintiff further alleges that "despite dozens of court decisions . . . finding that prosecutors had wrongfully failed to disclose evidence actually or potentially favorable to the defense," KCDA policymaking officials, including then-District Attorney Charles J. Hynes, failed to take corrective action, and that these actions and inactions caused the violation of Plaintiff's constitutional rights.  (*Id.* ¶¶ 125–27.)

The Court finds that the Amended Complaint plausibly states a *Monell* claim based on the failure to train, discipline, or supervise KCDA personnel with respect to their *Brady* obligations during the relevant time frame.  Plaintiff submits a list of more than 50 criminal cases from 1985 to 2010 in which the KCDA was found to have failed to disclose *Brady* material or other evidence favorable to the accused.[10]  (*See* List of Criminal Cases, Dkt. 33-13, at 2–6.)[11]  Moreover, high-ranking officials at the KCDA acknowledged during depositions in another case that the Office had no written policy for disclosing *Brady* material and stated they "were unaware of any ADA

---

[10] Most, but not all, of the cases on the list appear to involve misconduct that is at least somewhat similar to that at issue in this case.  (*See* List of Criminal Cases, Dkt. 33-13, at 2–6.)

[11] The Court observes that the list of criminal cases attached to Plaintiff's sealed and unredacted Amended Complaint differs from the list appended to the Amended Complaint on the public docket.  (*Compare* List of Criminal Cases, Dkt. 33-13, *with* List of Criminal Cases, Dkt. 32-13.)  Plaintiff is directed to attach the correct version (which the Court assumes is the longer list appended to the sealed Amended Complaint) when he files his Second Amended Complaint.  *See infra* Conclusion.

having ever been disciplined [for misconduct] during Hynes's tenure."[12]  (Am Compl., Dkt. 32, at 36 n.26); *see Johnson*, 2023 WL 11868258, at *14 ("Proof that a policymaker failed to respond to repeated complaints of constitutional violations is sufficient to establish deliberate indifference, but not required.").   Unlike Plaintiff's NYPD claim, the quantity and timespan of the cases referenced by Plaintiff combined with the specificity of the allegations about the KCDA's lack of training, supervision, and discipline nudge Plaintiff's KCDA claim into the realm of plausibility. *See Johnson*, 2023 WL 11868258, at *15–18 (finding plaintiff plausibly alleged deliberate indifference and widespread and persistent practice of failing to produce exculpatory information where complaint contained statements from prosecutors regarding a district attorney's office's procedures and practices and listed judicial decisions in which the district attorney office was found to have withheld evidence);[13] *Newson v. City of New York,* No. 16-CV-6773 (ILG) (JO), 2019 WL 3997466, at *8 (E.D.N.Y. Aug. 23, 2019) (denying motion to dismiss *Monell* claim where plaintiff "cite[d] 87 cases of prosecutorial misconduct by the QCDA between 1985 and 2004, including 28 cases in which the QCDA withheld *Brady* or *Rosario* material").

---

[12] Plaintiff also states that these officials "admitted that they were unaware of any specific training the Office provided on how to question or evaluate informant or accomplice witnesses," but does not explain how this fact, though generally relevant to *Brady* compliance, is relevant to his case.  (*See* Am. Compl. at 36 n.26.)

[13] The court in *Johnson* explained:

Plaintiff has adequately alleged deliberate indifference.  The City and [Queens County District Attorney's Office ("QCDA")] knew to a moral certainty that ADAs will come into possession of *Brady* materials because these are basic facets of an ADA's job.  Plaintiff has alleged that there was a history of *Brady* violations at the [QCDA].  Despite the [QCDA] policymakers' awareness of the prevalence and consequences of *Brady* violations, they did not take any action to train, supervise, or discipline prosecutors, and instead rewarded prosecutors who committed *Brady* violations.

2023 WL 11868258, at *18 (cleaned up).  The same rationale applies here.

27

Accordingly, Plaintiff's *Monell* claim based on the conduct of the KCDA may proceed.[14]

## C.     Claim Against the City for the Actions of Bellevue Hospital and the New York City Department of Corrections

Plaintiff's Fourth Cause of Action is a municipal liability claim against the City for the actions of Bellevue Hospital and the NYCDOC.  (*See* Am. Compl, Dkt. 32, ¶¶ 132–142.)  As to Bellevue, Plaintiff alleges that the City: (1) acted with "deliberate indifference to the constitutional rights of detainees in criminal cases" by "elect[ing] not to adopt minimally adequate policies, procedures, or standards, to train hospital personnel to recognize and report apparent cognitive impairment of pretrial detainees impacting their competency and/or guilt or innocence," (*id.* ¶ 133); and (2) "instituted and implemented plainly inadequate policies, procedures, regulations, practices, customs, training, or supervision, and discipline concerning the continuing duty of personnel within New York City hospitals, including Bellevue Hospital, to preserve and make timely disclosure . . . when they become aware . . . that a pre-trial detainee suffers from a medical condition or cognitive impairment that may be relevant to the detainee's competency and/or guilt or innocence," (*id.* ¶ 134).  As to the NYCDOC, Plaintiff alleges that the City "through policy and practice and/or through a deliberate indifference to the due process rights of pretrial detainees, had no training programs or policies in place requiring third-party contractors and/or [the] DOC to report when a detainee was diagnosed or suffered from a medical or cognitive disability relevant to the detainee's competence, ability to understand the proceedings, and/or guilty or innocence."  (*Id.* ¶ 137.)

---

[14] Defendants do not appear to dispute that Plaintiff has adequately pled a constitutional violation or causation with respect to this *Monell* claim.

At a minimum, Plaintiff's claim fails because the Amended Complaint does not plausibly allege that Bellevue or NYCDOC personnel violated Plaintiff's constitutional rights.  "Under Second Circuit case law, 'a prerequisite to municipal liability under *Monell* is an underlying constitutional violation by a state actor.'" *Daniels v. City of New York*, No. 16-CV-190 (PKC) (JO), 2018 WL 4119191, at *12 (E.D.N.Y. Aug. 29, 2018) (quoting *Henry-Lee v. City of New York*, 746 F. Supp. 2d 546, 567 (S.D.N.Y. 2010)); *Dorsey v. Gannon*, No. 22-2735, 2024 WL 1338772, at *3 (2d Cir. Mar. 29, 2024) (summary order) ("[T]here can be no *Monell* liability where there has not been an underlying constitutional violation." (citing *Segal v. City of New York*, 459 F.3d 207, 219 (2d Cir. 2006))).  Thus, "[w]here there is no underlying constitutional violation, there is no basis for a claim of municipal liability."  *Walston v. City of New York*, 289 F. Supp. 3d 398, 415–16 (E.D.N.Y. 2018), *aff'd*, 754 F. App'x 65 (2d Cir. 2019); *see also Askins v. Doe No. 1*, 727 F.3d 248, 253 (2d Cir. 2013) ("*Monell* does not create a stand-alone cause of action under which a plaintiff may sue over a governmental policy, regardless of whether he suffered the infliction of a tort resulting from the policy.").

Although the Amended Complaint alleges that the City should have trained personnel at Bellevue and the NYCDOC to report evidence of pretrial detainees' guilt or innocence, Plaintiff does not cite to any cases that suggest *Brady* obligations extend to either entity.  *See Bell v. Poole*, No. 00-CV-5214 (ARR), 2003 WL 21244625 (E.D.N.Y. Apr. 10, 2003) (finding "that the [NYCDOC] is in most respects, an administrative rather than a law enforcement agency" for the purposes of *Brady* (internal quotation marks omitted)), *aff'd*, 103 F. App'x 691 (2d Cir. 2004).  Nor has the Court been able to locate any authority for the proposition that either Bellevue or NYCDOC has a duty to proactively disclose a pre-trial detainee's medical information to law enforcement in this context.  To the contrary, such a rule would likely run afoul of patients' privacy

rights and statutory non-disclosure requirements.  *See, e.g.*, Health Insurance Portability and Accountability Act, 42 U.S.C. § 1320d-6 (prohibiting the disclosure of medical records without a patient's consent).  In the context of Bellevue, Plaintiff's proposed rule also would have the unfortunate consequence of forcing medical professionals to act as law enforcement officers, which undoubtedly would lead to numerous ethical and legal quandaries.  New York Social Services Law §§ 448–92, which Plaintiff cites in his opposition brief, (*see* Pl.'s Opp'n at 33), is wholly inapposite, as it mandates reporting of abuse, neglect, and mistreatment of "vulnerable persons."  *See* N.Y. Soc. Serv. Law § 488(1) (defining "[r]eportable incident").  The Court declines Plaintiff's request to judicially expand New York's mandatory reporting laws beyond their current reach.

For the reasons stated above, Plaintiff's municipal liability claim premised on the conduct of Bellevue Hospital and the NYCDOC is dismissed.

## CONCLUSION

For the reasons set forth above, Defendants' motion to dismiss is granted in part and denied in part. Plaintiff's Second and Fourth Causes of Action (*Monell* claims based on the actions of the NYPD, Bellevue Hospital, and the NYCDOC) are dismissed. Plaintiff's due process claim against Detective Paribello and Plaintiff's *Monell* claim against the City based on the actions of the KCDA may proceed. Plaintiff shall file a Second Amended Complaint, striking and modifying the pleadings consistent with this Order, within thirty (30) days of the issuance of this Order.[15]

SO ORDERED.

*/s/ Pamela K. Chen*
Pamela K. Chen
United States District Judge

Dated: August 13, 2024
       Brooklyn, New York

---

[15] The Court denies Plaintiff's request to be permitted to amend the Amended Complaint for any other purpose. Plaintiff, who was already given the opportunity to amend prior to the briefing of Defendants' motion to dismiss, is not entitled to keep amending the complaint, especially when doing so would be futile. *Chunn v. Amtrak*, 916 F.3d 204, 208 (2d Cir. 2019) ("Leave to amend may be denied if the proposed amendment would be futile.").